Charles AINI, I.C.E. Marketing Corporation, Jacob Aini and Topiclear Beauty Products, Inc., Plaintiffs,

v.

SUN TAIYANG CO., LTD., Palms Fashion, Inc., Jigu Trading Co., Inc., Societe Internationale de Cosmetiques, Marcel Cohne, CCI Co., REC Co., Emile Garou, Ismael Jedouane, Michel Farah, Mitchell Pharmaceuticals, New York Line Manufacture, and Choice International, Defendants.

SOCIETE INTERNATIONALE de COSMETICS, a French Corporation, Plaintiff,

v.

Charles AINI, Jacob Aini, Michael Aini, Raquel Aini, a/k/a Rachel Aini, and I.C.E. Marketing Corp., Defendants.

Nos. 96 Civ. 7763 (LAK), 96 Civ. 9318 (LAK).

United States District Court, S.D. New York.

May 6, 1997.

Peter L. Berger, Levisohn, Lerner, Berger & Langsam, Martin R. Friedman, O'Rourke & Friedman, for Plaintiffs in No. 96 Civ. 7763 and for Defendants in No. 96 Civ. 9318.

Harry Frischer, Solomon, Zauderer, Ellenhorn, Frischer & Sharp, Bernardo Burstein, Akerman, Senterfitt & Eidson, P.A., Ivan F. Blejec, Share & Blejec, P.C., for Certain Defendants in No. 96 Civ. 7763 and for Plaintiffs in No. 96 Civ. 9318.

## OPINION

KAPLAN, District Judge.

The prize for which these actions contend is the United States and worldwide rights in the TOPICLEAR trademark, a mark used on skin cream, lotions and soaps sold primarily to African American, Caribbean and African communities both here and abroad. The contenders are the French successors of Odette Anne–Marie Saffroy, the widow Triquet ("Triquet"), who was the first user of the mark and originator of TOPICLEAR products, and the Aini family.[1] In briefest summary, the genesis of the dispute is as follows:

Triquet invented a cleansing cream in the late 1970's, began selling it in France under the name TOPICLEAR, and registered the TOPICLEAR mark in France in 1980. In 1989, Charles Aini, whose family previously had purchased TOPICLEAR product from the Triquet interests, applied to register the mark in the United States. Triquet and later her successors in interest opposed the registration. In 1992, the parties resolved their dispute by (a) Triquet's successors withdrawing their opposition, (b) the formation of Topiclear Beauty Products, Inc. ("TBPI"), jointly owned by the Ainis and the Triquet successors, to exploit the mark, (c) an agreement by Jacob Aini, Charles' son, to contribute $100,000 to TBPI, and (d) an agreement by both sides to transfer all of

---

1. Sun Taiyang Co., Ltd., Palms Fashion, Inc., and Jigu Trading Co., Inc., defendants in No. 96–7763 (LAK), have settled with the Ainis. The claims initially asserted against them therefore need not be addressed.

their respective trademark rights to TBPI. Charles Aini subsequently obtained the U.S. registration for TOPICLEAR. Later in 1992, the parties considered and, allegedly, entered into a loan agreement that contemplated a $300,000 loan by Jacob Aini to certain of the Triquet successors, secured by a pledge of the borrowers' rights in the mark.

The Aini interests now claim that Charles Aini is the rightful owner of the U.S. registration which, they claim, is valid and enforceable, and that TBPI and/or Jacob Aini own all other worldwide rights in the mark by virtue of the 1992 agreement and an alleged default by and foreclosure of the interests of the Triquet successors under the loan agreement. They claim that the Triquet successors' use of TOPICLEAR infringes the Aini's mark.

The Triquet successors take a fundamentally different view. They begin from the premise that the Ainis are, in their words, "trademark pirates." They contend that the Ainis regularly appropriate in the United States marks used abroad by others and then apply those "pirated" marks to counterfeit goods the Ainis obtain from brokers. In this case, they assert, the Ainis adopted the TOPICLEAR mark in furtherance of just such a scheme and sought to register it here, fraudulently claiming priority of use. When the Triquet successors opposed the registration application, the Ainis first offered perjurious evidence in support of the application and then procured the withdrawal of the opposition—and thus procured the U.S. registration itself—by tricking them into signing the 1992 agreement. They contend that the 1992 agreement never came into force or was abandoned and therefore transferred no rights either to the Ainis or to TBPI. And they assert that no loan ever was made pursuant to the loan agreement and that no default therefore occurred. The Ainis' use of the TOPICLEAR mark, they maintain, infringes their rights. They seek cancellation of the U.S. registration and other relief.

The case was tried without a jury. This opinion contains the Court's findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a).

## Background

### The Parties and Their Initial Involvements With TOPICLEAR

#### The French Parties

Following Triquet's invention of the cleansing cream and the adoption of the TOPICLEAR mark, TOPICLEAR cream was promoted and distributed throughout the early and mid–1980's by Aqua Bella International ("ABI"), a company owned and controlled by Triquet. In 1984, she began distributing as well through Afro Stars Distributors ("ASD"), a company owned by Ismael Jedouane. The line was expanded in 1987 to include soaps and lotions and, in 1988, Office Central D'Achats ("OCA"), another company owned and controlled by Triquet, became an additional TOPICLEAR distributor.

In 1991, Triquet sold the TOPICLEAR business and mark to Creation Cosmetique International ("CCI"), a company of which Jedouane then was the president or general manager. Jedouane's associates in CCI included Emile Garau and, during part of the relevant period, Simone Mamane. This trio was associated also in a number of related companies including Laboratoire REC ("REC"), which had manufactured TOPICLEAR products for Triquet. In 1992, REC and other companies in which Jedouane and Garau held interests merged to form GMJ, which became a licensee of CCI for the manufacture and distribution of TOPICLEAR product.

In 1993, GMJ sought protection from the French bankruptcy courts. Two years later, Marcel Cohen invested in the reorganization plan of GMJ. Societe Internationale Cosmetique ("SIC"), owned 64 percent by Cohen and 12 percent each by Jedouane, Garau and Mamane. It was formed in furtherance of the reorganization and purported to acquire the TOPICLEAR business and mark from CCI in January 1996. (DX YG, ¶ 20; DX UO)

#### The Aini Family

The members of the Aini family relevant to this dispute are Charles Aini, his sons Jacob (Jack), Michael, and Howard, and Jack's wife, Raquel or Rachel Aini.

Charles Aini was born in Lebanon and emigrated to the United States in 1967. In 1973, he opened a retail store in Jamaica, Queens, called Cheila's which sold and continues to sell a variety of consumer products including cosmetics. In the mid–1980's, Charles Aini left Cheila's and went to work in a supermarket then owned by Michael Aini. He continues to this day to devote his business efforts exclusively to the supermarket.

Jack Aini began working part-time at Cheila's at about the time it opened and had a full-time role in the business by the time he reached age 13 in 1975, ultimately becoming the manager of the cosmetics section. He was expansion minded. In 1981, he opened his own retail store, Parkside Discount. In 1983, he opened the first of a number of Homeboys Discount Stores in Brooklyn. In the late 1980's, he decided to reach beyond his retail operations to manufacturing. importing and distributing products in the United States. He has been involved in doing so since the 1980's through a dizzying array of companies that have appeared and disappeared with some frequency. All have been little more than names used by Aini as a matter of convenience.

The first of these enterprises appears to have been A.B.C.E. Wholesale, Inc. ("ABCE"), which was formed in 1987 or 1988. In 1992 or 1993, ABCE was replaced by Zuri International, Inc. ("Zuri International"), which in turn was succeeded by Aya Products, Inc. ("Aya Products"). Jack Aini has been the *eminence* behind a number of other companies including Roldan Corporation ("Roldan"),which is discussed in greater detail below, RNM and King Cosmetics Co. His wife has been involved in all of the businesses, usually as a partner, and she frequently is the record holder of the Ainis' stock in them.

In the fall of 1995, Jack and his wife moved to Paris. They sold their interests in the U.S. retail and wholesale businesses to his brothers, Harry and Michael Aini, the latter of whom then left the family supermarket and became president of I.C.E. Marketing

Co. ("ICE"), also an Aini company.[2] Since the fall of 1995, Jack has been involved in real estate and other businesses and owns interests in companies which have opened Homeboys stores in Paris. He continues to be involved with Topiclear products.

In view of the claims asserted in this case, the adoption of the names of certain of Jack Aini's companies is of more than passing interest. Prior to the formation of Zuri International. Jack was aware that the word "Zuri" was the name of a brand of cosmetics well known in the African community. He nonetheless took the name for his new company, discontinuing its use only after the owner of the "Zuri" mark sued on trademark grounds.

Similarly, "Aya" was the name of a brand of cosmetics manufactured by Otentika in the 1980's which was known to Jack because he was a distributor of Aya products. Claiming that Otentika had abandoned the mark, Jack adopted "Aya" as the name of the company he formed to succeed Zuri International, promptly drawing litigation from Otentika which Jack won.

Following the Aya controversy, Jack formed Roldan, an episode which has been the subject of a reported decision by the United States District Court for the Southern District of Florida. According to the findings in that case, which were not seriously disputed at trial, Laboratorios Roldan, C. por A., is a long established Dominican company, the owner of the Dominican registration for the "Roldan" trademark, and the manufacturer of a very successful soap marketed in the Dominican Republic, the United States and elsewhere under that mark. In the late 1980's, Jack and Rachel bought and sold the "Roldan" product in the United States. In 1991, they sought a distributorship agreement for the product from Laboratorios Roldan. After being rebuffed, they formed an entity they named Roldan Corporation to produce products under the "Roldan" mark notwithstanding that they lacked any shred of authority from the trademark

2. One Symcha Horowitz appears also to have    had an interest in ICE at its inception.

owner to use the name.[3] In 1993, they sought to register the Roldan mark here, claiming that the Ainis were the first users of the mark in the United States. Laboratorios Roldan obtained a preliminary injunction against them, the court specifically rejecting the Ainis' claim that they were the first U.S. users of the "Roldan" mark. *Laboratorios Roldan, C. por A. v. Tex International, Inc.,* 902 F.Supp. 1555 (S.D.Fla.1995).

*The Introduction of TOPICLEAR in the United States*

Given the perceived importance to both sides of establishing first use of the TOPICLEAR mark in the United States, it is not surprising that the evidence is in sharp conflict.

Triquet and ASD began to advertise and promote TOPICLEAR in a French publication called *Amina,* which had extremely limited distribution in the United States (PX 89, at 38–43), as early as 1982. The Court finds that Triquet and/or ASD sold TOPICLEAR products to customers in the United States at least as early as October 1984. (DX BX; DX YG, ¶¶ 12, 24, 29–32, 36) In October 1985, ABI entered into an agreement making Sapdem Ltd., a company run by Felix Poblah, its exclusive U.S. distributor of TOPICLEAR product. (DX YB, at 3; DX YG, ¶ 36)

Jack Aini claimed that he first became aware of TOPICLEAR cream while on a trip to Nigeria in 1982 or 1983. He subsequently decided to make a line of soaps and lotions and chose the TOPICLEAR name for his products because, he said, he liked the name and was unaware of any such products in the U.S. market. (PX 56, at 3–4) He had the products made for him, he claimed, by his wife's cousin, a Mr. Chaiou. (*Id.* at 4) He began U.S. sales, he suggested, in mid–1984 and began purchasing TOPICLEAR cream from ABI for resale commencing in 1986 or 1987. (*Id.* at 5–6)

The Court does not accept Mr. Aini's account. There is no credible evidence that the Ainis had anything to do with TOPICLEAR products, whether originating from the French or their own efforts, before Jack Aini began buying TOPICLEAR cream from Sapdem in 1986 or somewhat later. (*See* DX YB, at 5–6; PX 79, at 6–7) Aini subsequently imported TOPICLEAR product directly from ABI and OCA. Indeed, in 1990, he wrote OCA to express his pleasure at OCA's willingness "to let us handle *your* products . . ." (DX AG, at W02488) (emphasis added) His claim that he had soaps and lotions, which he sold under the TOPICLEAR name, manufactured for him before he began distributing TOPICLEAR products purchased from Sapdem, ABI and OCA is unsubstantiated and unpersuasive.[4]

*The U.S. Registration*

On April 10, 1989, Jack Aini prepared, and Charles Aini signed, an application for federal registration of the mark "Topiclear Number One" for use on soaps, creams and lotions on April 10, 1989. Charles Aini there declared that he believed himself to be the owner of the mark, that to the best of his knowledge no one else had the right to use the mark, and that the dates of first use and of first use in commerce were January 16, 1989 and March 30, 1989, respectively.[5] (DX

3. When Jack Aini was asked during the trial of this action how he came to adopt the name Roldan for his company, he stated only that he liked the name. The Court does not credit that testimony.

4. The Court is aware of purported invoices from Chaiou & Chaiou, evidently a firm run by relatives of Rachel Aini, which appear to reflect earlier purchases. (PX 54) The Court is not persuaded that these documents are what they purport to be or that they reflect actual transactions. Mr. Chaiou, the alleged seller, was not called to testify despite the fact that his family relationship with the Ainis suggests that he was entirely at their disposal. The Ainis submitted no evidence of payment for any of these goods,

although canceled checks ought to have been available had the goods actually been purchased. Given the Court's assessment of Jack Aini's credibility, which rests in part on his demeanor and in part on such matters as the fraudulent statements he prepared for his father and submitted to the PTO and the backdating of the claimed date of the Ainis' alleged first use of the TOPICLEAR mark in the United States to meet the contentions raised by the Triquet successors in the trademark proceeding, *infra,* the Court concludes that this evidence is of no probative value.

5. On February 18, 1989, the Ainis prepared a substantially identical New York State trademark registration application. (DX C)

D) The application did not disclose Triquet's prior use of the mark or the fact that Jack Aini had been buying TOPICLEAR product from ABI, OCA and Sapdem for some time.

Triquet opposed the application. In answers to interrogatories, Charles Aini swore that it was he who decided to adopt the TOPICLEAR mark; placed the alleged date of his first use on June 23, 1985, almost four years earlier than the date claimed in the application; asserted that he did business as Topiclear Products; said that his TOPICLEAR products had been manufactured by Regent Traders of Geneva, Switzerland, from at least as early as May 1985 to the date of the answers; denied having filed any state trademark registrations for TOPICLEAR; said that Charles Aini first learned of Triquet's use of the mark in 1987 or 1988 from Jack Aini; denied the existence of any business relationship relating to TOPICLEAR with ABI and OCA; and stated that the only person who had provided information used in the preparation of the answers to interrogatories was Charles Aini. (DX G) In response to the request that the applicant identify the two persons having the best knowledge of his marketing of products under the TOPICLEAR name, Aini listed only himself. He did not mention Jack Aini.

Each and every one of the foregoing answers was false. Jack Aini, who prepared them, knew of their falsity. To the extent that Charles Aini had any information concerning the matters inquired of, he too knew that the answers were false.[6] Thus, the interrogatory response filed in the name and over the signature of Charles Aini was a fraudulent document contrived by Jack Aini in an effort to secure the U.S. registration to the TOPICLEAR mark. Indeed, the advancement of the alleged date of first use to June 1985, a backdating of nearly four years prior to the date claimed in the initial registration, manifestly was designed to establish priority of use over Triquet.

*The 1992 Agreement*

After Jedouane, Garau and Mamane, through CCI, acquired the TOPICLEAR business from Triquet, Jack Aini approached them in the hope of settling the trademark opposition. Over a period of three or four days in December 1991, Aini held a number of meetings with them in New York, some at the offices of Aini's lawyer, Martin Friedman. The Jedouane group returned to France and then came back to New York in January 1992, at which time the negotiations continued. The discussions were principally between Aini and Jedouane and were conducted in both Arabic and English. Garau and Mamane had some knowledge of English and understood parts of the conversations, with Jedouane translating into French for them as required.

*The Written Agreement*

On January 7, 1992, the parties reached an agreement (the "1992 Agreement") to resolve the trademark opposition and establish a framework for the parties to do business with one another. (PX 7) The document provided that the Jedouane group would withdraw its opposition to Charles Aini's registration application, that Charles Aini would assign his interest in the mark to Jack Aini once the registration issued, and that CCI and Jack Aini would transfer all of their patents, trademarks, and manufacturing processes to a new company, later identified as TBPI, to be established under New York law. TBPI was to have two classes of stock, one class to be held 25 percent each by Jack Aini, Jedouane, Garau and Mamane and the other, described as "a voting stock," to be held 50 percent by Jack Aini and 16 ⅔ percent each by Jedouane, Garau and Mamane. The board was to consist of four directors, three designated by Jack Aini and the other by Jedouane and his associates. Aini was to serve as president and "make all decisions in the ordinary course of the busi-

---

**6.** Charles Aini knew that he did not decide to adopt the TOPICLEAR mark, Jack did. He knew that he never did business as TOPICLEAR PRODUCTS. He knew that he had signed a New York State application to register the mark. He was aware that the person who knew more about the TOPICLEAR business than anyone else, and who provided all the information used in answering the interrogatories, was Jack. Moreover, although Charles Aini personally may not have known it, Regent Traders was simply a broker which had not manufactured anything for the Ainis.

ness." The shareholders were to enter "into a separate shareholders agreement" containing buy out provisions that would operate in the event any of the shareholders died or wished to sell his shares. TBPI was to enter into perpetual distribution agreements for TOPICLEAR products (a) for France with an entity owned by Jedouane, Garau and Mamane, and (b) for the rest of the world with Jack Aini or his designee. Aini was obliged to pay "the company holding the trademark" $100,000, $10,000 of which was due on signing and the balance six months hence.

The Agreement dealt also with the sources of the TOPICLEAR products—tubes of cream and gel, body lotion, soap, and jars of cream—to be sold by Aini's distribution company. All ultimately were to be manufactured by REC. (*Id.* at 3) At the time the Agreement was executed, however, it appears that REC made only tubes. (*Id.*) Jedouane, Garau and Mamane therefore agreed that the Ainis were free to continue purchasing body lotion, soap and cream in jars from other manufacturers until REC was in a position to supply those products formulated to Jack Aini's specifications. (*Id.* at 4–6)

The entire agreement was conditioned expressly upon Jedouane and his associates "producing specific evidence translated into English and certify[ing] that all payments have been made to the widow of JACQUES TRIQUET and that CCI and REC are corporations formed under French law and are in good standing ..." It recited also that the parties acknowledged that Aini's lawyer had represented Aini and his companies and that Jedouane, Garau and Mamane had been advised to retain their own counsel, but that they had chosen not to do so. (*Id.* at 7)

The 1992 Agreement was signed by (a) Jacob Aini; (b) Jedouane for himself, as attorney-in-fact for Mamane, and as president of CCI; and (c) Garau for himself and as president of REC. Although a line beneath the words "agreed to" was provided for the signature of Charles Aini, Charles Aini never signed the document, one of the many circumstances giving rise to disputes concerning whether the agreement ever came into force and, if so, its effects.

*Subsequent Conduct Referable to the 1992 Agreement*

The Triquet successors did not provide Jack Aini, prior to the commencement of litigation, with the "specific evidence" certifying that Triquet had been paid upon which the effectiveness of the 1992 Agreement was conditioned. Nevertheless, after the 1992 Agreement was signed by Jack Aini and the Jedouane group, the parties proceeded in some respects as if the agreement was in force and ignored it in others. Although Charles Aini never signed the agreement, the Triquet successors withdrew their opposition to Charles Aini's trademark application (PX 28), and the registration issued in due course. (PX 9) TBPI was formed, but the separate shareholders agreement referred to in the 1992 Agreement never was discussed, much less agreed upon. TBPI never entered into the distribution agreements referred to in the contract. None of the parties ever transferred any patents, trademarks or manufacturing processes to TBPI save that Charles Aini licensed the TOPICLEAR mark to TBPI for an indefinite term at a royalty of eight percent. (DX NO) Jack Aini never paid the $100,000 to TBPI that the agreement required, although the Court finds that Garau, Mamane and Jedouane asked that he pay the money to them or their companies rather than to TBPI and that Aini in fact did so.[7] Aini purchased TOPICLEAR tubes from REC, although not all of his requirements as the parties had contemplated. (PX 56, at 16; PX 16; PX 84, at 5–6, 38) Jack Aini, with the knowledge of the Jedouane group, also caused a number of infringement actions to be brought in the name of Charles Aini against alleged counterfeiters. (PX 56, at 12–13)

---

**7.** Aini testified that he paid the full amount although he produced at trial canceled checks totaling only $85,000. (PX 8, PX 53) Two of the checks, totaling $45,000 (*id.* check nos. 485 and 492), appear to reflect payment both for the Topiclear contract and something else in indeterminate proportions. Check no. 508, however, bears a legend indicating that it is the final payment for the contract. The Court finds that Aini paid the entire $100,000 and that the denials of Garau and Jedouane are not credible.

*The Alleged Loan*

Later in 1992, the parties began discussing the possibility of a $300,000 loan by Jack Aini to Jedouane, Garau, Mamane and their associate, Max Benatar, to be secured by the borrowers' interests in TBPI and the TOPI-CLEAR and other trademarks around the world, among other collateral. Aini's trademark attorney prepared a draft loan agreement, note and assignment on October 8, 1992 which Rachel Aini faxed to Jedouane on the same day with advice that the originals would follow for signature by courier. The draft documents, which were sent both in English and in French translation, proposed that the borrowers acknowledge receipt of the funds by signing the loan agreement. (PX 13, at F002631) With some modifications not relevant here, the borrowers signed the documents, which were dated as of October 21, 1992. (PX 14) The note was due and payable on October 21, 1994. (*Id.* Ex. A)

The questions whether Aini ever loaned the borrowers the $300,000 and whether the signed note and loan agreement ever were delivered to Aini were sharply contested at trial. Both sides contend that there was only one original of the documents, but the stories then diverge. According to Aini, he lent the money and had his lawyer retain the originals for safekeeping. Jedouane, however,

asserts that no money ever changed hands, that he held the originals pending receipt of the funds, and that Mamane improperly took the originals and gave them to Aini for use in this dispute.

The resolution of this dispute is far from simple. The Court is unimpressed with the candor and accuracy of both Aini and Jedouane. That Mamane abruptly changed sides is clear. Aini, quite remarkably, failed to produce a shred of documentary evidence to corroborate the assertion that he ever put up the $300,000.[8] In all the circumstances, the Court finds that it was the understanding of the parties that the delivery and effectiveness of the note and security agreement were conditioned upon the $300,000 changing hands, an event that never occurred. The putative borrowers therefore never delivered the loan documents, which came into Aini's hands by illegitimate means.[9]

*Cohen, SIC and the Emergence of the Controversy*

As previously noted, GMJ sought bankruptcy protection in France in 1993. In 1995, Marcel Cohen invested in its reorganization and formed SIC. By an agreement dated May 11, 1995, Jedouane, Mamane and Garau transferred to SIC their "75% participation held in" TBPI.[10] (DX SQ, Art. 1)

8. Mamane testified at his deposition that Aini paid the $300,000 in several installments, ending prior to October 1992, all of which consisted of cash delivered in bags wrapped in newspaper. (PX 64, at 70–74, 82–84) Mamane, of course, now works for and has been bought out by Aini and is in the midst of a dispute with his former partners. The Court does not credit his account.

9. The evidence on this point hardly could be more divergent. Aini's counsel, who drafted the documents in the first place, claimed at trial that the signed originals were given to him by Aini in late 1992 after Aini returned from Paris and had remained in his files ever since. (Tr. 200–01) As indicated in the text, Jedouane acknowledged having signed the originals but testified that he never voluntarily parted with them and that they were purloined by Mamane after Mamane fell out with Jedouane and began cooperating with Aini. The Court finds that Jedouane's account is more likely true than that of Aini and his counsel.

The $300,000 note was payable according to its terms in 1994, and that sum plainly was a lot of money to Aini. Nevertheless, there is not

a shred of evidence that Aini ever demanded payment or even referred to the existence of the note between October 1992, when his wife transmitted the unsigned documents to France, and November 1, 1996, when Aini first demanded payment. (PX 33) Indeed, the complaint in this action, which was filed on October 11, 1996, did not mention it. What is highly significant, however, is that Aini obtained a declaration from Mamane, given in Paris, on October 23, 1996 for use ill this case. (Mamane Decl., Oct. 23, 1996) The declaration makes clear that Mamane had fallen out by that date with Jedouane, and the fact that he provided it to Aini shows that his loyalties had shifted. That the first mention of the note occurred eight days later is powerful corroboration of Jedouane's account.

10. This agreement did not differentiate between the two classes of TBPI stock contemplated by the 1992 Agreement. The Court nevertheless assumes that the sellers assigned to SIC all of their right, title and interest in TBPI.

*The Shareholders Meetings*

Exactly what transpired between Jack Aini and SIC during mid–1995 is not clear. By late in the year, however, the dispute now before the Court began to emerge. Jedouane, Mamane and Garau met with Aini in Paris on October 13 and demanded the production of various documents pertaining to TBPI. When Aini did not comply, the trio called a shareholders meeting to take place in Paris on December 7, 1995. (PX 19, at F003071) Aini responded by purporting to call a shareholders meeting to occur on November 29, 1995 in New York (PX 20, at F002869), a notice promptly rejected by Jedouane (PX 19, at F003579)

There is no evidence that the scheduled November 29 meeting took place. On December 4, however, Aini acquired Mamane's shares in TBPI and commenced litigation in state court in Kings County (DX WK), and Mamane resigned as a director of TBPI (PX 20). The net of the Kings County claim was that Charles Aini owned the mark, Jack Aini controlled TBPI, and the 1992 Agreement was a dead letter.[11] On December 7, Aini followed up this salvo with a letter to Jedouane and his *confreres* in which he advised them that Aini, by virtue of the Mamane purchase, owned 66⅔ percent of the shares of TBPI, purportedly had removed them as directors and officers, and had declared the meeting set for that date as "without force and effect." Picking up a theme first played in the Kings County lawsuit, he declared that proof of payment of Triquet, the condition to the effectiveness of the 1992 Agreement, never had been provided and, in consequence, that TBPI never acquired the TOPICLEAR mark and therefore could not transfer it. (*Id.* at F002987–88) He noticed another shareholders meeting to take place in Brooklyn on December 21, 1995. (*Id.* at F002989)

Notwithstanding Aini's December 7 letter, the shareholders meeting called by the Jedouane faction went forward in Paris on that date with Aini in attendance. Aini purported to declare the meeting illegal and to remove all of the directors. (PX 19, at F03165) His efforts were ignored by the others, who purportedly adopted resolutions canceling the 1992 Agreement, "restor[ing]" the TOPICLEAR trademark to CCI, and demanding that Aini produce the TBPI corporate records. (*Id.* at F003169–70)

It appears that the New York shareholders meeting took place on December 21, 1995 notwithstanding the previous events in Paris. In advance thereof, however, SIC, claiming ownership of 75 percent of TBPI's shares, granted a proxy to Aini to elect Jedouane, Cohen and Garau as the officers of the corporation.[12] (*Id.* at F003045) The record does not disclose exactly what transpired.

*The Kings County Decision*

The dispute concerning the two shareholders meetings soon was brought before the court in Kings County, and hearings were held on May 14 and September 18, 1996, evidently on cross-motions for interlocutory relief.[13] In a decision rendered on the latter date, the court, without prejudice to a decision after trial on the merits, set aside the results of both shareholders meetings, directed that a new meeting be called, and ruled that Aini would be entitled to vote 66⅔ percent of the shares at that meeting. *Aini v. Garau*, Index No. 44351/95, bench op. at 20 (N.Y. Sup.Ct. Kings Co. Sept. 18, 1996).

*The United Kingdom Litigation*

With Aini in temporary control of TBPI and the rights of the parties in sharp dispute, the litigation battlefront broadened. Charles Aini held the registration for the TOPI-

---

11. The complaint alleged, among other things, that (1) the 1992 Agreement had been conditioned upon the production of proof that Triquet had been paid, proof that had not been forthcoming, and that Aini therefore had not assigned the TOPICLEAR mark to TBPI (DX WK ¶¶ 11–14, 18–20), (2) Aini had been defrauded into paying the $100,000 described above (*id.* ¶¶ 23–24), (3) the defendants owed Aini $300,000 on the promissory note (*id.* ¶¶ 27–28), and (4) the defendants had breached the 1992 Agreement by selling

TOPICLEAR products in the United States (*id.* ¶¶ 29–34).

12. They presumably believed that Aini was obliged to act in accordance with their wishes.

13. In the meantime, SIC sued the Aini interests in France, claiming that they were selling counterfeit TOPICLEAR products in derogation of its rights. (DX YH, ¶ 16)

CLEAR mark in the United Kingdom as well, and SIC moved to cancel it. Although the Jedouane group purportedly had canceled the 1992 Agreement on December 7, 1995, Cohen, in a declaration dated August 19, 1996, asserted that Charles Aini was not the proprietor of the TOPICLEAR mark because he was obliged by the 1992 Agreement to assign his rights to Jack Aini, who in turn was obliged to assign them to TBPI. (PX 25, ¶ 6) He produced what purported to be evidence that Triquet had acknowledged payment on January 14, 1992 in order to demonstrate that the 1982 Agreement was in full force and effect. (*Id.* ¶ 7)

Charles Aini responded in an affidavit dated November 22, 1996, in which he claimed ownership of the mark in the United States. (DX CC ¶ 4) He denied that the 1992 Agreement ever had come into force:

> "It is absolutely denied that I, Charles Aini, was party to any agreement of 7 January 1992. It is true that my son Jacob Aini negotiated a provisional agreement between the parties which I was subsequently invited to review. *However on review I did not consider the proposed agreement to meet my commercial needs, and I never signed it* ... Accordingly, it is denied that this agreement ever entered into force. Jacob Aini had no power to bind me to any agreement ..." (*Id.* ¶ 5) (emphasis added)

### The Florida Litigation

Nor were the parties content to litigate only in London and Brooklyn. On September 16, 1996, SIC sued the Ainis and ICE in Miami in the action to which reference already has been made. SIC there sought cancellation of the Charles Aini's U.S. registration, damages for false registration, and relief for trademark infringement, unfair competition and violation of its alleged rights under the Paris Convention. The premise of the action, of course, is that SIC is the rightful owner of the TOPICLEAR mark.

### The Ainis' Action

The Ainis responded to the filing of the Florida action and the Kings County decision by commencing No. 96 Civ. 7763 in this Court in October 1996 and seeking a temporary restraining order and a preliminary injunction. Insofar as remains relevant, the plaintiffs, Charles Aini and ICE, claimed in the original complaint that Charles Aini is the registered owner of the TOPICLEAR mark in the United States and that the defendants were infringing, and threatening to infringe, the trademark and introducing counterfeit TOPICLEAR products into the market in violation of Section 43(a) of the Lanham Act. They sought, in addition, damages for alleged unjust enrichment and an accounting.

### The Promissory Note

On November 1, 1996, following the institution of the Ainis' action in this Court, Jack Aini's counsel wrote to counsel for the makers of the $300,000 note and advised him that the debt remained unpaid. He extended "one final ten day period" within which they might pay the note. When payment was not forthcoming, Aini purported to exercise his rights to transfer all of the debtors' right, title and interest in and to the TOPICLEAR mark worldwide and to TBPI to himself and demanded that the debtors cease all manufacturing and distribution of TOPICLEAR products. (PX 33; PX 23)

### Prior Proceedings

When the Charles Aini–ICE preliminary injunction motion came on for argument, the parties agreed to transfer the Florida action to this Court and to proceed promptly to trial. The Ainis subsequently amended their complaint. Both actions now have been tried and are ripe for decision.

### Discussion

As already is clear, the positions of the parties have undergone considerable change during the past months.

The Ainis initially disavowed the 1992 Agreement. Having acquired Mamane's interest in TBPI, however, they now claim that the 1992 Agreement is valid and enforceable. Starting from that premise, they maintain that TBPI, which they now claim to control, owns all U.S. rights in the TOPICLEAR mark as successor in interest to Charles Aini. They assert also that Jack Aini owns all

other rights in the mark, worldwide, having succeeded to rights that he contends formerly were owned by Jedouane, Mamane and Garau upon their default on the $300,000 note.

SIC and its associates now claim that SIC owns all rights in the TOPICLEAR mark worldwide. Charles Aini, they argue, never had any rights in the United States and, in any case, obtained the U.S. registration by fraud. They contend that the 1992 Agreement never was binding and, in any case, was abandoned, although they asserted as recently as August 1996 that it was in full force and effect. From these premises, they argue that neither the Ainis nor TBPI owns any interest in the TOPICLEAR mark.

### I. The Infringement Claims

In considering the parties' respective infringement claims, the logical starting point is to determine what rights, if any, each had in the TOPICLEAR mark prior to the 1992 Agreement and then to consider the effects of the subsequent dealings between the parties.

*The TOPICLEAR Mark Prior to the 1992 Agreement*

*The Ainis' Rights*

It is important at the outset to recognize the essential nature of a trademark and the rights it carries and to distinguish them from registration.

■ This Court recently has written that:

"A trademark is, essentially, a designation of origin. It serves to inform the public of the source of the goods. As the public comes to know a trademark, it relies on the trademark as a sign that the goods sold under that trademark are of the same quality as goods that it has purchased from that source before. This public association between goods of a certain quality and a trademark benefits the owner of the trademark by making it easy for consumers to find its product and it benefits consumers by allowing them more easily to find goods of a particular producer that have given them satisfaction in the past.

"These functions of trademarks have led the law to treat trademarks differently from other species of property. Because the value of a trademark arises from its association with goods of a particular quality and source, a trademark comes into existence only once it is affixed to goods in commerce. Likewise, a trademark cannot be transferred except in connection with a business. Otherwise, the mark would cease to signify the source and quality of the goods to which it once related and the public would be confused or misled by continued use of the trademark. For the same reasons, although a trademark can be licensed, the licensor must retain some degree of control over the quality of the goods marketed under the trademark by the licensee." *Liebowitz v. Elsevier Science Ltd.,* 927 F.Supp. 688, 695–96 (S.D.N.Y.1996) (citations omitted).

One therefore may not "own" a trademark unless one uses the mark as a designation of origin on or in connection with goods or services made or furnished by or under one's control. *Id.* Ownership, moreover, is a product of use, not of registration. 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION ("MCCARTHY") § 19:3 (4th ed.1996); *see San Juan Products, Inc. v. San Juan Pools, Inc.,* 849 F.2d 468, 474 (10th Cir.1988). Nevertheless, the fact that Charles Aini's application for registration of the TOPICLEAR mark was granted, and the mark placed on the principal register of the PTO, on March 16, 1993 (PX 9), is relevant to the determination of any rights owned by him.

■ Section 7(b) of the Act makes the certificate of registration *prima facie* evidence of (1) the validity of the mark, (2) the registrant's ownership thereof, and (3) the registrant's exclusive right to use the mark in commerce on or in connection with the goods or services specified in the certificate. 15 U.S.C. § 7(b). Inasmuch as registration was granted less than five years ago, however, the mark is not incontestable. *See* 15 U.S.C. § 1065. The presumption created by Section 7(b) therefore is rebuttable. *E.g., Flexitized, Inc. v. National Flexitized Corp.,* 335 F.2d 774, 779 (2d Cir.1964), *cert. denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965); *see Aluminum Fabricating Co. v.*

*Season–All Window Corp.,* 259 F.2d 314, 316 (2d Cir.1958). Accordingly, SIC may overcome the presumption that Charles Aini owns the TOPICLEAR mark in the United States upon proof by a preponderance of the evidence that he does not. 4 McCarthy § 32:138.

■ Charles Aini, by his own admission, never manufactured, imported, formulated, distributed or controlled the quality of the product. From 1973 until the mid–1980's, he ran a retail store in Queens and has worked in the family supermarket ever since. His only contact with the product allegedly was having sold it at retail at Cheila's, a dubious assertion but one that is not material in any case. There simply is no colorable claim that Charles Aini ever owned the TOPICLEAR trademark.

Jack Aini testified that he caused the TOPICLEAR registration to be obtained in the name of his father out of respect for the family patriarch. The implicit suggestion is that Jack was the beneficial owner of the mark and Charles simply a nominee. Whatever legal consequences might flow in other circumstances from such an arrangement, this contention does not avail the Ainis here. The Court finds that the Triquet interests were the first to use the TOPICLEAR mark in the United States, having begun using it here at least as early as late 1985. Jack Aini's connection with the mark began subsequently and as a reseller of the Triquet products.[14] To whatever extent he had products made for him prior to the 1992 Agreement by manufacturers other than those affiliated with Triquet and her successors and labeled those goods with the TOPICLEAR mark, a matter which need not be decided, he did so as an infringer of the Triquet mark. Hence, even if Charles Aini properly were regarded as a nominee for Jack Aini's rights in the mark, he held no more than Jack Aini owned—and Jack Aini owned nothing. Ac-

cordingly, when the parties came together in late 1991 to begin the discussions that led to the 1992 Agreement, the Ainis, as a matter of law, brought no rights in the mark to the table.[15]

*The Triquet Interests*

Given that the Triquet interests were the first to use the mark in the United States, they were the owners prior to the 1992 Agreement as long as (1) the mark was protectible. and (2) they did not abandon it.

■ The protectibility question is not a difficult one. A putative trademark is protectible without proof of secondary meaning if it is arbitrary, fanciful or suggestive. If it is descriptive, it is protectible only if it has developed secondary meaning. *E.g., Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). "A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Estee Lauder, Inc., v. The Gap, Inc.,* 932 F.Supp. 595, 606 (S.D.N.Y.1996) (quoting *Stix Products, Inc. v. United Merchants & Mfrs. Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968) (Weinfeld, J.)), *aff'd in relevant part and rev'd on other grounds,* 108 F.3d 1503 (2d Cir.1997). The Court finds that the word TOPICLEAR is suggestive. "Topi-" is the root of "topical," which is an adjective used, among other things, to indicate that a matter is intended for local application, as to the skin. The word TOPICLEAR therefore indicates to one who engages in the appropriate thought process that the product is intended for application to the skin and that it will assist the user in attaining clear skin.

■ Nor is abandonment a serious problem. While the Court accepts that Triquet's initial use of the mark in the United States was spotty (*see* DX YG, ¶¶ 29–35), the volume picked up substantially following the conclusion of the distribution agreement with

14. As between a foreign manufacturer and a U.S. distributor of trademarked goods, all U.S. rights in the mark generally remain with the manufacturer absent an agreement to the contrary. 4 McCarthy § 29:8; *see* Restatement (Third) of Unfair Competition § 34, *cont. d* (1995). There was no such agreement here, so Aini's distribution of Triquet's products created no rights in him.

15. This discussion of course relates to the common law right to the mark as distinguished from the status of the registration, *cf.* 2 McCarthy § 20:53, at 20–91, which is dealt with below.

Sapdem (*see* DX IH, IR, EJ, EK, EM). The intervals between shipments and the other circumstances do not remotely support a finding of abandonment. *See* 2 McCarthy §§ 17:9–17:15; Restatement (Third) of Unfair Competition § 30(2)(a), *cmts. a & b* (1995).

Accordingly, Triquet or her companies owned the TOPICLEAR mark in the United States as a matter of common law prior to the 1992 Agreement, although they made no effort to register it in this country.

*The 1992 Agreement*

What has been said thus far disposes of the trademark infringement claims of Charles Aini and ICE against SIC and its affiliates. As neither ever had any interest in the mark, they have no claims for infringement. The next question, which bears on SIC's infringement claims, is whether the 1992 Agreement resulted in the mark then owned by the Triquet interests passing to TBPI. This requires determination of whether there was an enforceable contract and, if so, of its effect.

*The Parties Formed a Contract*

SIC and its associates contend that the 1992 Agreement never became a binding contract because Charles Aini never signed it and, in any case, it was no more than an agreement to agree. They suggest also that the agreement was obtained by fraud and overreaching perpetrated by Jack Aini and his lawyer, who allegedly procured the signatures of Jedouane, Garau and Mamane by misrepresenting the terms and legal effect of the document to them and taking advantage of their alleged lack of legal representation.

■ *1. The Lack of Charles Aini's Signature.* The absence of the signature of a contracting party is not necessarily inconsistent with the formation of a binding contract.

A contract arises as long as the terms are understood by the parties and each manifests its intent to be bound even in the absence of one or more signatures.[16] Here, there is no evidence that Charles Aini knew of the existence of the 1992 Agreement until years afterward, much less that he contemporaneously agreed to be bound by it. That, however, is not the end of the analysis.

For one thing, Charles Aini at this point certainly has manifested his intention to be bound by the 1992 Agreement. Moreover, whatever claim anyone in the Aini family had to the TOPICLEAR mark was owned by Jack Aini—he owned the business that was dealing in TOPICLEAR product. The Court finds that Jack Aini intended to retain beneficial ownership of and control over the registration applied for in the name of Charles Aini and that Charles Aini acted on the understanding that he would take whatever action with respect to the registration that Jack Aini might request. In substance, then, by completing the application for registration in his father's name and procuring Charles Aini's signature on it, Jack Aini did no more than attempt to transfer, gratuitously, naked legal title to his own claim to the mark. Whatever the consequences of this effort, and there are at least two possibilities,[17] Charles Aini had no claim or rights for which the Jedouane group bargained that he was in a position to withhold or that Jack Aini was not bound to transfer. In consequence, the absence of Charles Aini's signature on the 1992 Agreement is of no legal significance.

■ *2. Fraud and Related Issues.* The Triquet successors next contend that the 1992 Agreement is unenforceable because it was procured by fraud. Briefly stated, they contend that Jack Aini and his lawyer, Martin Friedman, took advantage of the allegedly poor English language abilities of Je-

**16.** *E.g., Girard Life Insurance, Annuity & Trust Co. v. Cooper,* 162 U.S. 529, 543, 16 S.Ct. 879, 883–84, 40 L.Ed. 1062 (1896); *Genesco, Inc. v. Joint Council 13, United Shoe Workers of Am., AFL–CIO,* 341 F.2d 482, 486 (2d Cir.1965); *Allen v. National Video, Inc.,* 610 F.Supp. 612, 631 (S.D.N.Y.1985); *Helen Whiting, Inc. v. Trojan Textile Corp.,* 307 N.Y. 360, 364, 121 N.E.2d 367 (1954); *see Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993).

**17.** One alternative is that Jack Aini's action was an assignment in gross, which would be ineffective to transfer any rights to Charles Aini. *See, e.g.,* 2 McCarthy §§ 18:1–18:2. And even if some rights were transferred effectively to Charles Aini, certainly the intention was that Jack Aini retained others, including the right to dispose of the entire interest in the mark and the goodwill associated with it.

douane and Garau and their lack of legal counsel to obtain their signatures to a document the terms of which were quite different than they were led to believe.

A great deal of ink could be spilled dealing with this assertion, but it is unnecessary. Having heard the witnesses, evaluated their demeanor, and considered all the evidence. the Court finds that Jedouane and Garau (a) were advised that Friedman was representing Aini, not them; (b) knowingly decided not to engage counsel; and (c) signed the 1992 Agreement with the full knowledge and intention of binding themselves to legal obligations. While it is possible that their language difficulties did not give them as full an understanding of the document as they might have gained had it been in their native language, they were aware of the essential points and were not deceived in any significant way. Most importantly, they are conclusively presumed in law to have known the legal effect of the document they signed[18] and will not be heard to argue the contrary.

■ *3. Failure to Agree on Material Terms.* SIC and the Triquet successors argue also that the 1992 Agreement is not binding because the parties failed to agree upon material terms. They point to the failure of the parties to prepare the shareholder and distribution agreements contemplated by the contract. (SIC Trial Mem. 37)

It is well established of course that "[i]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract ..." *Cobble Hill Nursing Home v. Henry & Warren Corp.,* 74 N.Y.2d 475, 482, 548 N.Y.S.2d 920, 923, 548 N.E.2d 203, 206 (1989), *cert. denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). Nor can a court "enforce a contract unless it is able to determine what in fact the parties have agreed to ..." *166 Mamaroneck Avenue Corp. v. 151 East Post Road Corp.,* 78 N.Y.2d 88, 91, 571 N.Y.S.2d 686, 687, 575 N.E.2d 104, 105 (1991). But these principles do not permit parties dissatisfied with their bargains to seize upon every ambiguity or drafting fail-

ure or, indeed, failure of agreement as to minor matters to avoid their obligations. "Thus, where it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term, the court should endeavor to hold the parties to their bargain ..." *166 Mamaroneck Avenue,* 78 N.Y.2d at 91, 571 N.Y.S.2d at 688, 575 N.E.2d at 106 (citation omitted). The court in appropriate circumstances may excise an indefinite portion of an agreement without affecting the validity of the remainder. *Reiburn v. Roseman,* 22 N.Y.2d 143, 145, 292 N.Y.S.2d 65, 66, 239 N.E.2d 174, 174-75 (1968). As the New York Court of Appeals has stated, "[s]triking down a contract as indefinite and in essence meaningless 'is at best a last resort' ..." *166 Mamaroneck Avenue,* 78 N.Y.2d at 91, 571 N.Y.S.2d at 688, 575 N.E.2d at 106 (quoting *Cohen & Sons v. M. Lurie Woolen Co.,* 232 N.Y. 112, 114, 133 N.E. 370 (1921)).

The threshold question is whether the parties intended to be bound by the 1992 Agreement notwithstanding the fact that it left for future agreement the terms of the anticipated shareholders' and, arguably, distribution agreements. *E.g.,* I. E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.8c (1990). The Court finds that they did. The core of the deal reflected in the 1992 Agreement was the resolution of the PTO opposition proceeding regarding the Aini attempt to register the TOPICLEAR mark in the United States, the establishment of a jointly owned company (TBPI) to own the marks claimed by Aini, and the grant of exclusive distribution rights for France and for the rest of the world to the Jedouane group and to Aini, respectively. Certainly the buyout provisions of the anticipated agreement among shareholders of TBPI were not indispensable to the fundamental arrangement set out in the 1992 Agreement, as evidenced by the fact that neither side ever took even a single step toward raising the issue once the 1992 Agreement was in place. And while the

---

18. *E.g., Borouchov v. Strobel,* No. 95 Civ. 0611 (JSM), 1995 WL 510013, at *3–*4 (S.D.N.Y. Aug. 28, 1995); *Morgan Guar. Trust Co. of New York v. Republic of Palau,* 693 F.Supp. 1479, 1498

(S.D.N.Y.1988) (signer of contract strictly bound by terms irrespective of whether signer read or understood the document).

terms on which Aini and the Jedouane group would distribute TOPICLEAR products in their respective territories following the 1992 Agreement were at the heart of the arrangement, those terms were specified in the 1992 Agreement itself.[19] Thus, it is difficult to see what was left for further agreement. The Court therefore finds that the 1992 Agreement in fact contained the material terms of the distribution agreements among the parties and that the reference to future distribution agreements reflected merely an intention to confirm those already binding terms in another form. Alternatively, the Court finds that anything left to future agreement was not material. Accordingly, the Court finds that the 1992 Agreement was intended to be, and was, binding notwithstanding the failure to enter into the contemplated stockholders' and distribution agreements.

■ *4. Alleged Abandonment.* SIC and its associates next contend that the Ainis enjoy no rights under the 1992 Agreement, even if the contract ever came into force, because it was abandoned by the parties. The argument is without merit.

It is certainly true, as SIC maintains, that parties may abandon a contract and that the intention to abandon need not be manifested expressly, but may be inferred from the circumstances. *Armour & Co. v. Celic,* 294 F.2d 432, 436 (2d Cir.1961); *United States v. International Brotherhood of Teamsters,* 816 F.Supp. 864, 870 (S.D.N.Y.1992), *aff'd,* 986 F.2d 15 (2d Cir.1993). Nevertheless, a breach of or failure to perform does not constitute abandonment. *Carver v. Apple Rubber Products Corp.,* 163 A.D.2d 849, 558 N.Y.S.2d 379 (4th Dept.1990). Rather, the intention to abandon the contract must be unequivocal and mutual, and the circumstances must be inconsistent with its continued existence. *AEB & Associates Design Group, Inc. v. Tonka Corp.,* 853 F.Supp. 724, 733 (S.D.N.Y.1994); *Rosiny v. Schmidt,* 185

A.D.2d 727, 587 N.Y.S.2d 929 (1st Dept.), *leave denied,* 80 N.Y.2d 762, 592 N.Y.S.2d 671; 607 N.E.2d 818 (1992). Its existence is an issue of fact. *Matter of Rothko's Estate,* 43 N.Y.2d 305, 324, 401 N.Y.S.2d 449, 457, 372 N.E.2d 291, 298–99 (1977).

The SIC group argues that the parties here all proceeded without regard to the 1992 Agreement and thus evidenced their intention to abandon it. They point out that Charles Aini never assigned the U.S. registration to Jack Aini, Jack Aini never in turn assigned it to TBPI, the shareholder and distribution agreements never were negotiated, TBPI never became more than a shell company, and sales of TOPICLEAR product were not made to TBPI but to other entities used for that purpose by Jack Aini. (SIC Trial Mem. 36)

While this evidence is entitled to consideration, it is far from the whole story. For one thing, the facts that various Aini companies bought the goods rather than TBPI and that TBPI never really got off the ground are ambiguous, as they are fully consistent with the use by all parties of corporate names and entities as little more than flags of convenience. More importantly, as the Court already has found, Jack Aini paid—and Jedouane and his colleagues accepted—the $100,000 called for by the 1992 Agreement. In addition, Aini shifted all or part of his purchasing to REC as contemplated, thus further benefiting the Jedouane group. These actions suggest strongly—notwithstanding the Ainis' later self-serving declarations that the 1992 Agreement never became effective—that Jack Aini regarded the agreement as binding. Surely the Jedouane group's acceptance of these benefits, not to mention their own assertions that they regarded the agreement as binding, point to the same conclusion as to is members.

In all the circumstances, the Court finds that the parties—although none of them ad-

---

**19.** The 1992 Agreement made the Aini and Jedouane distribution companies REC's exclusive distributors of TOPICLEAR tubes in cream and gel form, fixed the price they would pay to REC for the product, required REC to pay any taxes on the transactions, and gave Aini limited rights to have TOPICLEAR tubes in cream and gel form made for it by other manufacturers if REC

proved unable to meet quality standards. (PX 7, at 3–4) The agreement further provided that REC would commence manufacturing TOPICLEAR products other than tubes in cream and gel form and that both Aini and the Jedouane group would purchase those products from it once it did so. (*Id.* at 4–5) The prices for these products also were set. (*Id.* at 6)

hered to the letter of the 1992 Agreement, sometimes by mutual consent and sometimes not—did not intend to abandon their bargain. It was only when Cohen came on the scene and sought ownership and control of the mark that the parties began their posturing about the legal effect of the agreement, none of which is particularly convincing in view of the inconsistency of each side.

The foregoing demonstrates that the 1992 Agreement is an enforceable agreement. The next question is whether it transferred ownership of the TOPICLEAR mark from the Triquet successors, specifically CCI, to TBPI.

*The Effect of the Agreement on Ownership of the Trademark*

■ A trademark of course is a species of property and therefore subject to assignment.[20] Whether the 1992 Agreement effected such a transfer, a matter governed by New York law,[21] requires some analysis.

■ "An assignment is a transfer or setting over of property, or of some right or interest therein, from one person to another, and, unless in some way qualified, it is properly the transfer of one whole interest in an estate or chattel or other thing." *Griffey v. New York Century Ins. Co.*, 100 N.Y. 417, 422, 3 N.E. 309 (1885) (quoted in *In re Houbigant, Inc.*, 914 F.Supp. 964, 987 (S.D.N.Y.1995)). While New York law requires no special form or forms to effect an assignment, the present surrender of the putative assignor's right, title and interest is essential to a valid assignment. *E.g., Leon v. Martinez*, 84 N.Y.2d 83, 88, 614 N.Y.S.2d 972, 974, 638 N.E.2d 511, 513 (1994); *Maloney v. John Hancock Mutual Life Ins. Co.*, 271 F.2d 609, 614 (2d Cir.1959); *Whalen v. Gerzof*, 206 A.D.2d 688, 615 N.Y.S.2d 465, 467 (3d Dept.), *leave denied*, 84 N.Y.2d 809, 621 N.Y.S.2d 518, 645 N.E.2d 1218 (1994).

At first blush, the 1992 Agreement appears to fall short of this standard. It speaks prospectively, stating "that CCI shall transfer all its trademarks" to TBPI (PX 7, at 1), thus perhaps suggesting that the agreement contained no more than an executory promise to make an assignment in the future.[22] On reflection, however, the Court rejects this view.

■ The substance, not the form, prevails in determining whether a particular transaction constitutes an assignment. *E.g., Estate of Palmer*, 53 Misc.2d 217, 220, 278 N.Y.S.2d 352, 355 (Surr. Ct. Broome Co.1967). As in any other contract dispute, the issue ultimately depends upon the intention of the parties. *Leon*, 84 N.Y.2d at 88–89, 614 N.Y.S.2d at 974–75, 638 N.E.2d at 513–14; *see Maloney*, 271 F.2d at 614. Moreover, New York "recognize[s] the validity of conditional assignments …" *Maloney*, 271 F.2d at 614. Thus, it is perfectly possible for parties to enter into a valid assignment subject to the occurrence of conditions. *Id.*

In this case, there are at least two possible constructions of the prospective contract language. One might, to be sure, interpret the words as reflecting a promise to assign the mark in the future. On the other hand, the language is equally consistent with a simple recognition of the fact that the entire agreement was conditioned expressly upon the Jedouane group producing proof that they in fact had paid Triquet in full. In other words, the language well could have been intended to mean, in substance, that the assignment of the marks would be effective upon the production of the proof of payment or the waiver by the parties of that condition.

Viewing the entire agreement in context, the Court finds that the parties intended the 1992 Agreement to vest in TBPI, subject only to the satisfaction of the proof of pay-

---

**20.** The fact that a trademark is merely a symbol of the goodwill, inuring to—and inseparable from—the owner's business, results in special considerations relevant to its transfer. *See* 2 McCARTHY §§ 18.1–18.2. As there is no claim here that an assignment of CCI's rights to TBPI in the circumstances of the 1992 Agreement would have run afoul of these special considerations, there is no need to consider them here.

**21.** The 1992 Agreement contains a New York choice of law clause. (PX 7, at 7).

**22.** The language respecting Jack Aini's transfer of the U.S. mark is parallel. (PX 7, at 1).

ment condition. all of the right, title and interest of CCI and the Ainis in the TOPI-CLEAR mark. Had the proof of payment condition been satisfied promptly after the execution of the 1992 Agreement, the matter would have been straightforward. The assignment would have been effective long before CCI purported to assign its rights to SIC in January 1996, and CCI clearly would have had nothing to convey. But nothing about this case is straightforward.

In the United Kingdom litigation in which SIC sought cancellation of Charles Aini's U.K. registration, Aini rested his claim of ownership on the proposition that the 1992 Agreement never had come into force. (DX CC, ¶ 5; *see* PX 25, ¶ 7) He evidently contended, *inter alia*, that no proof of payment ever had been tendered—in response to which Cohen filed an affidavit attaching what purported to be the requisite proof, which bears the date January 14, 1992. (PX 25. Ex. 7; DX NH, DX NI) Aini responded, albeit on information and belief, that the document was a forgery. (DX CC, ¶ 8) Thus, there are questions as to (a) whether the requisite proof existed, (b) if so, when it was tendered, and (c) whether any of this matters to the validity of the assignment.

Given this background, it is curious indeed that the proof at trial did not squarely address these points. Nevertheless, the record is sufficient for the Court to make the necessary findings. To begin with, the Court is satisfied that the Jedouane group paid Triquet for the TOPICLEAR business. There simply is no reason to believe that the founder of this valuable business walked away from it without recompense. Nor is there any substantial basis for supposing that the Triquet acknowledgment (DX NH, DX NI), which was received in evidence without objection, is a forgery.[23] Hence, the proof of payment upon which the 1992 Agreement was conditioned has existed since January 1992. The question is whether the failure to tender that proof to the Ainis prevented the assignment of CCI's rights to TBPI from becoming effective prior to the date on which

CCI transferred the very same rights to SIC. In this Court's judgment, it did not for at least two reasons.

First, the Court infers from Cohen's production of the Triquet document in mid–1996, the failure of either side to tender any evidence from Triquet at trial, and from evidence that Triquet could not be located by mid1996 (DX CC, ¶ 9) that the document had been in the possession of the Jedouane group since 1992. The satisfaction of the contractual condition therefore was entirely within their control at all times. They accepted benefits of the 1992 Agreement, including Aini's $100,000 and the profits on the TOPI-CLEAR products purchased from REC, without objection. They will not now be heard to contend that their assignment of CCI's rights to TBPI was ineffective because they elected not to tender the proof upon which the agreement was conditioned. *M. O'Neil Supply Co. v. Petroleum Heat & Power Co.*, 280 N.Y. 50, 56, 19 N.E.2d 676 (1939) (party "cannot rely on the condition precedent to prevent recovery where the nonperformance of the condition was caused or consented to by itself.").

■■■ Second, conditions to contracts may be waived, and waivers may be inferred from conduct as long as the intention clearly appears. *See, e.g., Dun & Bradstreet Corp. v. Harpercollins Publishers, Inc.*, 872 F.Supp. 103, 109 (S.D.N.Y.1995). Here, Aini paid and the Jedouane group accepted the $100,000 called for by the 1992 Agreement notwithstanding the fact that the Triquet acknowledgment had not been produced. The Court therefore finds that the parties intended to dispense with that condition and shifted ground only when it became expedient in the course of this and related litigation.

For all of the foregoing reasons, the Court holds that TBPI acquired by assignment all of CCI's right, title and interest to TOPI-CLEAR trademarks in the United States and wherever else in the world CCI owned such marks as of January 14, 1992. The necessary consequence of this holding is that any use in the United States by SIC and its

---

**23.** Surely, it would be preposterous given Charles Aini's testimony at trial, which established that he knows virtually nothing about any

of the matters in dispute, to accept his affidavit to the U.K. trademark authorities as competent evidence that the Triquet document is forged.

associates of the TOPICLEAR mark infringes TBPI's mark unless there is some other defense to such a claim.[24]

## II.  Cancellation of the U.S. Registration

■ SIC and its compatriots seek cancellation of Charles Aini's U.S. registration of the TOPICLEAR mark, essentially on the ground that Aini never had any interest in the mark and therefore was incapable of registering it.

Section 37 of the Trademark Act of 1946, 15 U.S.C. § 1119, provides in relevant part:

> "In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, . . . and otherwise rectify the register with respect to the registrations of any party to the action."

The statute thus gives the federal courts concurrent power with the PTO to cancel a trademark registration. 4 McCARTHY § 30:109. Accordingly, courts may order cancellation for any of the reasons enumerated in Section 14 of the Act, 15 U.S.C. § 1064. *Id.* § 30:112. Broadly speaking, "cancellation [of marks less than five years old] may be based on any ground in the Lanham Act that would have barred registration in the first instance." *Id.* § 20:52, at 20–89 to 20–90; *accord, International Order of Job's Daughters v. Lindeburg & Co.,* 727 F.2d 1087, 1091 (Fed.Cir.1984).

Section 2(d) of the Act provides that registration will be refused if the mark sought to be registered "so resembles a mark . . . previously used in the United States by another and not abandoned as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d). The mark registered by Charles Aini—TOPICLEAR Number One—was substantially identical to the mark previously used in the United States by the Triquet interests. There simply is no colorable claim that he was entitled to registration. Accordingly, the judgment entered herein will provide for cancellation of the U.S. registration held by Charles Aini.

## III.  Jack Aini's Claim on the Note and Loan Agreement

■ Jack Aini claims that he is entitled to recover $300,000 on the October 21, 1992 promissory note and to a determination that he has acquired all of the collateral pledged pursuant to the attendant loan agreement, which includes among other things all of the TBPI stock owned by the Jedouane group, which subsequently was transferred to SIC.[25] There is no basis for this claim.

As the Court already has found, the note and loan agreement were executed in anticipation that Jack Aini would lend Jedouane, Garau and Mamane $300,000. The money never was forthcoming. The documents were not delivered by the makers.

The delivery of a note or other instrument was essential at common law and under the former Negotiable Instruments Law to the inception of any legal obligation.[26] It re-

---

24. There is no contention that the CCI to TBPI assignment ran afoul of the prohibition on assignment in gross.

25. In view of the Court's disposition of this claim, there is no need to determine the effect of the Jedouane group's transfer of their TBPI shares to SIC in 1995 notwithstanding the provisions of the 1992 loan agreement.

26. *E.g., State of New York v. Barclays Bank of New York, N.A.,* 76 N.Y.2d 533, 536–37, 561 N.Y.S.2d 697, 698, 563 N.E.2d 11, 12 (1990); *Irving Trust Co. v. Leff,* 253 N.Y. 359, 363, 171 N.E. 569 (1930) ("A check has no valid inception until delivery."). The possession and production of a negotiable instrument by a person who is not its maker raises a presumption that delivery has been made and that the holder is the owner of the instrument. *Cowee v. Cornell,* 75 N.Y. 91 (1878). This presumption is irrebuttable as to holder in due course, and rebuttable otherwise. *Leff,* 253 N.Y. at 363, 171 N.E. 569; N.Y.UNIF. COMM. C, § 3–306 (McKinney 1991). Thus, a claim of non-delivery may defeat the enforcement of a disputed promissory note when enforcement is sought by a person other than a holder in due course. N.Y.U.C.C. § 3–306(c) (McKinney 1991). The Court finds that Aini is not a holder in due course, as he did not take the note for value, and did not take in good faith because of his knowledge that the note was purloined by Mamane. N.Y.UNIF. COMM. C. § 3–302(1)(a), (c). Thus, the defense of non-delivery, which the Court finds established by a preponderance of the evidence, precludes Aini's enforcement of the note.

mains so under the Uniform Commercial Code.[27] Accordingly, the note and loan agreement never gave rise to any legal obligation. Aini's claims based upon them are without merit.

### IV. Goods Sold and Delivered

SIC and GMJ claim that Aini is indebted to it for over $1 million for goods sold and delivered. The evidence, which was unrefuted by any that the Court finds persuasive, is that RNM owes REC and GMJ 2,351,713.75 francs and 209,766.77 francs, respectively, and that La-La Designs, another Aini company, owes GMJ 204,404.70 francs. (DX YF, at 14–18; DX XE; DX XF) As it is perfectly clear that RNM, even assuming that it is a corporate entity, is an *alter ego* of Jack Aini, REC is entitled to judgment against Aini for the sum owed to it by RNM, translated into dollars according to law.[28] GMJ, however, is not a party to the action. There is no evidence that any of the existing parties is an assignee of or otherwise has succeeded to its rights. Accordingly, no judgment will be entered for the sums claimed by it.

### V. Exports to the United States

The Ainis seek also to enjoin the SIC and Jedouane interests from exporting products under the TOPICLEAR mark to the United States on the theory that they (or TBPI) owns the mark in this country. SIC and Jedouane rejoin that their TOPICLEAR products are genuine and, in consequence, that no injunction should issue.[29]

The principles governing this claim are straightforward. The gravamen of a claim of trademark infringement is consumer confusion as to source. The sale by a person other than the trademark owner of genuine goods under the owner's mark deceives no one concerning the source of the products and therefore does not infringe the mark. *Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir.1994). In order for goods to qualify as "genuine," however, they must conform to the trademark owner's quality control standards.[30] *Id.* at 78–80.

The pertinent facts in this case are clear. The TOPICLEAR tubes sold in the United States by Aini and his companies since the 1992 Agreement have been manufactured for him by REC and others. The Court is not persuaded that the tubes which SIC and the Jedouane group have exported, and wish to export, to the United States for sale by persons other than Aini are any different than those sold to Aini. In consequence, the REC TOPICLEAR tubes are genuine within the meaning of the cases, and their sale in the United States by SIC and its affiliates does not infringe TBPI's U.S. mark. On the other hand, the record is equally plain that REC never has made the soaps, lotions and other products sold by Aini under the TOPICLEAR mark. There is no basis for concluding that such products, if sold here by SIC and its affiliates, would be "genuine." TBPI therefore is entitled to an injunction restraining such sales.

### VI. Personal Jurisdiction

The jurisdictional defenses of Jedouane and Garau are easily disposed of. Jedouane and Garau negotiated and signed the 1992 Agreement—the genesis of a good part of this dispute—in New York. The agreement contained a New York choice of law clause. It specifically contemplated the formation of TBPI, an entity in which they would own shares, as a New York corporation. To suggest that this action does not arise out of

---

**27.** *State of New York, supra* note 26, 76 N.Y.2d at 536–37, 561 N.Y.S.2d at 698, 563 N.E.2d at 12.

**28.** Aini has not suggested that he is not personally responsible for any debt owed by RNM, although he contends that no money is owed. (*See* PTO 3–11; Pl. Pretrial Mem.; Pl. Posttrial Mem.).

**29.** The Ainis and TBPI do not assert that the exports in question constitute a breach of the 1992 Agreement or any other contractual arrangement among the parties. Accordingly, the matter need not be addressed.

**30.** The sale in the United States of foreign-made goods which are not intended for sale here and which differ materially from goods so intended infringes a U.S. mark. *E.g., Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68, 72–73 (2d Cir.), *cert. denied*, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987). Cases reached by this standard are merely a subset of the broader set described in the text.

their transaction of business in New York, or that they lack sufficient contacts with this forum to make the exercise of jurisdiction over them reasonable, is absurd.

■ Marcel Cohen, the owner of 64 percent of the stock of each of SIC and GMJ, contends that he has had very little contact with New York, that he does not direct the day-to-day activities of the latter company, and that he is not subject to jurisdiction here on the claim of trademark infringement asserted against him. It is reasonably plain, however, and the Court finds, that Cohen is the moving force behind the effort to capture the TOPICLEAR U.S. rights for SIC. He does not deny that he controls the day-to-day operations of SIC. He caused SIC to sue the Ainis and ICE in Miami for cancellation of Charles Aini's U.S. registration. The value of his investment in the GMJ reorganization in France is dependent in at least some significant degree on the outcome of this litigation. He has the largest personal financial interest in the shipment by SIC and/or GMJ of TOPICLEAR products into the United States. The Court therefore infers, particularly given the informality with which all of the corporations and other entities involved in this matter operate, that Cohen is subject to long-arm jurisdiction on the infringement claims because he is the "moving, active conscious force behind" the alleged infringement. *Bambu Sales, Inc. v. Sultana Crackers, Inc.,* 683 F.Supp. 899, 913 (E.D.N.Y.1988) (quoting *Polo Fashions, Inc. v. Branded Apparel Merch.,* 592 F.Supp. 648 (D.Mass.1984)).

■ The question of jurisdiction over Michel Farah and his company, Mitchell International Pharmaceuticals Ltd., both of which are located in England, is somewhat different. The pretrial order, which amended the pleadings (PTO at 3), simply asserted that Farah and Mitchell manufactured TOPICLEAR products for GMJ. (*Id.* at 11) While it contended that the products thus manufactured were sent to the United States, it did not charge Farah or Mitchell with sending them to this country. The evidence at trial, the Court finds, established that Mitchell simply makes the product in England for GMJ, that title passes in England, and that

GMJ is responsible for shipping the goods to the United States. (DX YJ ¶¶ 4–11) Nevertheless, it appears, in light of *Lipton v. The Nature Co.,* 781 F.Supp. 1032, 1035–36 (S.D.N.Y.1992), *aff'd.,* 71 F.3d 464 (1995), that the Court has jurisdiction over these parties because their manufacture and packaging of TOPICLEAR products in England for export to the United States constituted the commission of a tortious act outside New York causing injury within New York. *See* N.Y. CPLR § 302(a), subd. 2.

### Conclusion

As amended by the pretrial order, the relief sought in these actions is as follows:

The Aini group and SIC each seek to enjoin the other from continued use of the TOPICLEAR mark and damages for its alleged infringement. SIC seeks cancellation of Charles Aini's U.S. registration of the mark. Jack Aini seeks a determination that he has acquired worldwide rights in the TOPICLEAR mark and manufacturing processes as well as ownership of all of the stock of TBPI pursuant to the October 21, 1992 agreement and, it appears, judgment on the promissory note. The SIC group seeks judgment for damages for goods delivered. The issue of damages for trademark infringement and unfair competition has been severed. (PTO, § XI)

In view of the foregoing discussion, an interlocutory judgment to the following effect will enter:

1. TBPI is entitled to a permanent injunction restraining SIC and the Jedouane group from infringing the TOPICLEAR mark in the United States, provided, however, that the injunction will not restrain them from exporting to the United States TOPICLEAR tubes manufactured by REC which are the same as the TOPICLEAR tubes made by it for Aini. All other claims for trademark infringement and unfair competition, whether brought by the Ainis, SIC or the Jedouane group, are dismissed save for any remaining claim by TBPI for damages for trademark infringement.

2. REC shall recover of Jack Aini the appropriate dollar equivalent of 2,351,713.75 francs together with prejudgment interest according to law.

3. Aini's claim on the promissory note and his claim, derived from the October 21, 1992 agreement and the note, to ownership of worldwide TOPICLEAR trademark and manufacturing rights and of the stock of TBPI owned by the Jedouane group (other than Mamane) is dismissed.

4. The claims against Choice International shall be dismissed pursuant to stipulation.

The Court will hold a conference with counsel on May 19, 1997 at 2:00 p.m. in Courtroom 12D to fix a schedule for any necessary proceedings with respect to damages for trademark infringement and unfair competition.

Settle judgment on five business days notice.

SO ORDERED.