## TACTICA INTERNATIONAL, INC., Plaintiff,

### v.

**ATLANTIC HORIZON INTERNATIONAL, INC., Robert Ferreira, Alice Ricafort, Taylor Gifts, Inc., Elysee Cosmetics, Ltd., Elysee Beauty Products, Ltd., and Patrick Bousfield, Defendants.**

### No. 01 Civ. 1234(SAS).

United States District Court, S.D. New York.

April 27, 2001.

Roger A. Colaizi, Damon W.D. Wright, Venable, Baetjer, Howard & Civiletti,

**590**

LLP, Washington, DC, for Tactica International, Inc.

Paul W. Garrity, Jonathan Cooperman, Kelley Drye & Warren LLP, New York City, for Atlantic Horizon International, Inc., Robert Ferreira, Alice Ricafort, Elysee Cosmetics, Ltd., Elysee Beauty Products, Ltd., and Patrick Bousfield.

James B. Swire, Bruce Ewing, Dorsey & Whitney LLP, New York City, for Taylor Gifts, Inc.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Tactica International, Inc. ("Tactica") seeks a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining defendants, Atlantic Horizon International, Inc. ("AHI"), Robert Ferreira, Alice Ricafort, Taylor Gifts ("TG"), Elysee Cosmetics, Ltd. ("Elysee"), Elysee Beauty Products, Ltd. ("Elysee Beauty"), and Patrick Bousfield, from infringing upon Tactica's trademark, trade dress, and/or patent rights in the sale, distribution, or advertising of various beauty related products. Tactica further seeks to prohibit AHI, Ferreira, and Ricafort from engaging in unfair competition, disclosing, revealing or using Tactica's confidential information, misappropriating Tactica's trade secrets, and interfering with Tactica's contractual relations with certain third-parties. Tactica's claims are brought pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), 35 U.S.C. § 271, and New York common law. For the reasons set forth below, Tactica's application is partially granted.

## I. INTRODUCTION

Although Tactica has brought multiple claims against numerous defendants, this dispute boils down to one question: Who owns the trademark rights for the CELLULIFT and TOUCH'N'GO names in the United States? From 1996 to September 2000, Tactica and Elysee worked together to develop and distribute various beauty-related products in the United States and other parts of the world. Two such products were CELLULIFT, a massage system designed to hide the appearance of cellulite, and TOUCH'N'GO, a permanent hair removal system. At the time Elysee and Tactica began to do business together in 1996, Elysee did not sell any products in the United States. Tactica has been selling health and beauty products in the United States since 1992. During their business relationship all CELLULIFT and TOUCH'N'GO products sold in the United States were sold by Tactica under its IGIA brand name. There is no written agreement governing their business relationship.

After their relationship soured, Bousfield, Elysee's Director, approached Ferreira, a former employee of Tactica, and asked him whether his company, AHI, would be interested in becoming Elysee's exclusive mail order catalogue distributor of TOUCH'N'GO and CELLULIFT 2 in the United States.[1] AHI agreed and has been working with Elysee since December 2000. Elysee has engaged another company, Retail Distributors, Inc., to be its exclusive United States retail distributor for these products.

In January 2001, AHI displayed TOUCH'N'GO and CELLULIFT 2 at a Housewares Show in Chicago. It was at this show that Tactica first became aware that the TOUCH'N'GO and CELLULIFT

---

**1.** CELLULIFT 2 is Elysee's "improved" version of CELLULIFT. Elysee is no longer offering the original CELLULIFT to its distributors.

2 products were being sold and marketed in the United States under the Elysee brand name.

## II. PROCEDURAL HISTORY

On February 16, 2001, Tactica filed a Complaint against AHI, Ferreira, Alice Ricafort, and TG. Four days later Tactica filed an Order to Show Cause for a Preliminary Injunction and Temporary Restraining Order ("TRO"). The Court signed a TRO prohibiting defendants from intentionally infringing Tactica's trademark and patent rights and scheduled a preliminary injunction hearing. The hearing began on March 30, 2001, and continued the following week on April 3 and 4.[2] On the first day of the hearing, Tactica filed an Amended Complaint, naming Elysee, Elysee Beauty, and Bousfield as additional defendants to this action.[3]

## III. FINDINGS OF FACT

### A. Parties

Since 1992 Tactica has been in the business of marketing, distributing and selling various personal-care beauty products in the United States and other parts of the world. *See* Tr. at 41 (Testimony of Ramchandani, President of Tactica). Tactica is run by Ramchandani, and Avi Sivan, Chief Executive Officer ("CEO"). Tactica markets its products under the name IGIA

Direct and is the owner of the federally registered trademark, IGIA.

Elysee, a company organized and existing under the laws of the United Kingdom, is also in the business of developing and distributing personal-care beauty products. *See* Declaration of Patrick Bousfield in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Bousfield Decl.") ¶ 2. Like Tactica, Elysee markets and distributes its products worldwide. *See id.* ¶ 3.

Ferreira began working for Tactica as a shipping clerk in mid–1996. *See* Affidavit of Robert R. Ferreira in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Ferreira Aff.") ¶ 20. In April 1997, Ferreira was promoted to shipping manager, whose primary function was to coordinate shipments from overseas vendors to and from Tactica's fulfillment house. *See id.* ¶¶ 23, 27. Ricafort worked at Tactica as an accounts receivable clerk from mid–1996 through January 1999. *See* Affidavit of Alice Ricafort in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Ricafort Aff.") ¶ 2. Her duties were limited to dealing with accounts receivable, and on occasion, accounts payable. *See id.* ¶¶ 3, 5. Both Ferreira and Ricafort signed Confidentiality and Non–Compete Agreements while at Tactica. *See* Plaintiff's Exhibits ("Pl.Exs.") 54 and 55. Ferreira and Ricafort resigned from Tactica in October 1998 and January 1999, respectively. *See* Ferreira Aff. ¶ 30; Ricafort Aff. ¶ 2. Six

---

**2.** On April 10, 2001, the Court also heard testimony from a witness via telephone. Counsel for all parties were present on this call.

**3.** Because AHI, Ferreira and Ricafort had already served their Answer, Tactica, by letter to the Court, sought leave to file its Amended Complaint. *See* 3/29/01 Letter; Fed.R.Civ.P. 15(a) (After a responsive pleading has been served, "a party may amend [its] pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."). The addi-

tional defendants were present during the preliminary injunction hearing and are essential to the proper adjudication of this dispute. As such, leave has been granted and the Amended Complaint is deemed properly filed. Jonathan Cooperman, Esq., Counsel for AHI, Ferreira and Ricafort, indicated that his firm will be representing the additional defendants in this action. *See* Hearing Transcript ("Tr.") at 138. The effect of the preliminary injunction on Elysee, Elysee Beauty and Bousfield is discussed in Section VI, *infra.*

months after Ferreira resigned from Tactica he founded AHI, a distributorship originally designed to distribute medical supplies to the Middle Eastern market. *See* Ferreira Aff. ¶¶ 33, 34. In recent months, AHI has begun to expand its product line to include personal-care beauty products. *See id.* ¶ 34.

TG is a mail order catalog business which sells various beauty-related products through print catalogues and its website— *www.taylorgifts.com. See* Affidavit of Mark F. Wills, Director of Operations and Purchasing for Taylor Gifts, in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Wills Aff.") ¶ 2. Until July 2000, TG purchased the TOUCH'N'GO and CELLULIFT products from Tactica. *See id.* ¶ 4. TG currently orders these products directly from Elysee. *See id.*

### B. The Development of CELLULIFT and TOUCH'N'GO

#### 1. CELLULIFT

CELLULIFT is a massage system consisting of a suction system and rollers that knead the thighs or arms in order to reduce the appearance of cellulite. *See* Tr. at 46 (Ramchandani); Pl. Exs. 47–48. In February 1997, Ramchandani and Sivan attended a trade show in Germany, *see* Tr. at 47–48 (Ramchandani), 386 (Sivan), where they observed a massage system manufactured by the Phillips Company, known as Cellesse. *See* Tr. at 47–48

(Ramchandani); Pl.Ex. 15. They purchased the product and brought it back to the United States. *See* Tr. at 47–48 (Ramchandani), 386 (Sivan). They began experimenting with the product and brainstorming about how they could improve upon it. *See* Tr. at 47–48 (Ramchandani), 386 (Sivan). Tactica came up with the idea of using a cream with the product, as well as adding a suction and heating mechanism. *See* Tr. at 48–49 (Ramchandani). Tactica conveyed its ideas and a brochure for Cellesse to Bousfield.

In October 1997, Bousfield visited Tactica's offices to discuss the idea of developing a massage system.[4] *See* Tr. at 211 (Bousfield); Bousfield Decl. ¶ 23. At the meeting, Tactica and Elysee decided to jointly develop the product. Sivan suggested the name CELLULIFT and everyone agreed.[5] In March 1998, Tactica filed an "intent-to-use" application for the CELLULIFT name with the Patent and Trademark Office ("PTO"). *See* Declaration of Avi Sivan on Behalf of Tactica International, Inc. ("Sivan Decl.") ¶ 11; Pl.Ex. 10. Tactica has also filed trademark applications for the CELLULIFT name in Australia, New Zealand, Israel, and the European Union. *See* Pl.Ex. 31. Because Bousfield assumed Tactica would be Elysee's exclusive United States distributor of CELLULIFT, he did not object to Tactica's application in the United States. *See* Tr. at 105, 181 (Bousfield). Tactica also

---

4. Bousfield testified that Tactica did not contribute to the idea for this product. According to Bousfield, he became aware of Cellesse in August 1997 and purchased the product a month later. He then had Aole Boysen, his designer, make drawings of an improved version of the product. Bousfield took the product and drawings to the October 1997 meeting. *See* Tr. at 211–16 (Bousfield). Although Bousfield and many discussions .with Ramchandani and Sivan from August to October 1997, he testified that he never told them of the idea for this product because he wanted to

"surprise" them. *See* Tr. at 211–16 (Bousfield). Bousfield's testimony on this issue is not credible.

5. In Bousfield's declaration he states that he came up with a list of five or six prospective names for the product and he forwarded this list to Tactica for comments. *See* Bousfield Decl. ¶¶ 31–33. During the hearing Bousfield conceded that Sivan originated the CELLULIFT name. *See* Tr. at 228 (Bousfield).

filed a utility patent application for a "CELLULIFT MASSAGE SYSTEM WITH GEL DISPENSER" on November 24, 1998. *See* Declaration of Catherine Voorhees on Behalf of Tactica International, Inc. ¶ 3; Tr. at 55–56 (Ramchandani). In a fax dated March 1, 1999, Bousfield indicated that he would send Tactica copies of the original drawings for CELLU-LIFT in order to facilitate the process. *See* Pl.Ex. 25.

Once the idea for CELLULIFT was conceptualized, Aole Boysen, Elysee's design engineer, created general assembly drawings, outlining the make-up and components of CELLULIFT. *See* Def. Exs. 7 and 8. Pre-production models were prepared and shown to Tactica at a meeting in the United Kingdom in April 1998. At that meeting problems relating to the rollers, suction and vibration of CELLULIFT were discussed. *See* Tr. at 221–22 (Bousfield). In addition, there were discussions relating to the shape of the handle because Sivan was concerned that the handle was too big for a woman's hand. *See* Tr. at 217–18 (Bousfield); 388 (Sivan). Subsequent to the meeting, the final drawings were forwarded to a manufacturing company in Hong Kong, Grandeur Development, and production of CELLULIFT commenced. *See* Tr. at 102–03 (Bousfield). All development costs were borne by Elysee, who in turn recovered its costs, as well as a profit, through its selling price. *See* Tr. at 85–86, 142, 238–39 (Bousfield); Def. Ex. 27. Elysee worked directly with Grandeur and oversaw the manufacturing process.

Sometime in May or June 1998, Elysee caused the first shipment of CELLULIFT to Tactica. *See* Tr. at 92 (Bousfield). Be-tween July and October 1998, a New Jersey company called Clinical Research Laboratories ("CRL") performed a clinical study on the product. *See* Pl.Ex. 25. This trial was funded by Tactica.[6] *See* Tr. at 92 (Bousfield). At the end of 1998 Tactica hired the law firm of Hall, Dickler, Kent, Friedman & Wood, LLP to seek approval of CELLULIFT before the Food and Drug Administration ("FDA"). *See* Sivan Decl. ¶ 46; Pl.Ex. 22–24. Elysee did not contribute to the costs of this representation. *See* Sivan Decl. ¶ 46.

In January 1999, Elysee began to sell CELLULIFT under its brand name outside the United States. *See* Tr. at 146 (Bousfield); Def. Ex. 27. In total, Elysee has sold 225,000 units, 150,000 of which were sold to Tactica.[7] *See* Tr. at 99; 243 (Bousfield). Besides selling CELLULIFT in the United States, Tactica also arranged for shipments of CELLULIFT branded with the IGIA mark to countries around the world, including Germany, Turkey, Australia, and New Zealand. *See* Tr. at 182 (Bousfield). Tactica would arrange for these shipments through Elysee or directly through Grandeur. *See* Tr. at 182–89 (Bousfield); Pl.Ex. 29. Bousfield was aware that shipments of CELLULIFT arranged by Tactica were branded with the IGIA mark. *See* Tr. at 185 (Bousfield).

## 2. TOUCH'N'GO

Towards the end of 1996, Elysee began to work with Tactica to introduce the ELYSEE Hair Remover into the United States. *See* Tr. at 78–79 (Bousfield). At Elysee's direction, this product was manufactured by Grandeur and shipped to Tactica for sale in the United States. *See* Tr. at 78–79 (Bousfield). In early 1997, Tacti-

---

6. A European trial was also conducted which was not funded by Tactica. *See* Tr. at 92 (Bousfield).

7. According to Sivan, Tactica has sold approximately 142,000 units. *See* Tr. at 379 (Sivan).

ca was sued in the United States by a small company in the cosmetics business who owned the trademark ELYSEE. *See* Tr. at 206 (Bousfield). Without making any changes to the product, the name was changed to the IGIA Hair Remover. *See* Tr. at 80, 205–06 (Bousfield).

After experiencing problems with the connectivity of the tweezers attached to the IGIA Hair Remover, Tactica marketed a new hair removal product, IGIA Sure, which was supplied by KMC, a California corporation. *See* Tr. at 62, 70, 301 (Ramchandani), 208 (Bousfield); Pl. Exs. 2 and 56. Unlike the IGIA Hair Remover, the IGIA Sure contained a set of tweezers that were gold plated and connected completely. *See* Tr. at 381 (Sivan). In light of the favorable response from consumers, Tactica approached Elysee with the IGIA Sure and suggested creating a similar product, the IGIA Gold. *See* Tr. at 208 (Bousfield), 382 (Sivan).

Sometime in 1998, the idea for TOUCH'N'GO was born. In 1998, both Tactica and Elysee became aware of products using a new technology—a galvanic current—to remove unwanted hair. *See* Tr. at 106–07 (Bousfield), 382–83 (Sivan). These products included the RIO, manufactured by a company called Dezac, and the DERMAPEN, manufactured by Beauty Co. *See* Tr. at 106–07 (Bousfield), 382–83 (Sivan). Unlike the previous products which used the radio frequency method to remove hair, a product using galvanic current provides a consumer with permanent hair removal. *See* Tr. at 107 (Bousfield), 383 (Sivan). Tactica provided articles relating to the galvanic method to Elysee, information relating to the RIO hair removal product, and had many meetings with Elysee relating to this technology. *See* Tr. at 208–09 (Bousfield), 383–84 (Sivan).

Tactica and Elysee were excited about the possibility of developing a galvanic hair removal product incorporating the use of pads and tweezers. However, they were also aware of patents covering parts of this process. *See* Tr. at 107–08 (Bousfield), 383 (Sivan); Def. Ex. 40. In light of the success of Elysee's previous hair removal products, Bousfield met with Herbert Lee Cole, the patent holder, during the summer of 1998, and worked out a licensing agreement with Elysee. *See* Tr. at 107–08 (Bousfield). A written agreement was signed in February of 1999. *See* Def. Ex. 40. Tactica is not a party to this agreement.

After Bousfield met with Cole, Elysee had Boysen, its designer, develop drawings for TOUCH'N'GO. *See* Tr. at 108 (Bousfield); Def. Ex. 9. In November 1998, Bousfield visited Tactica's offices in New York with two rough, non-working mockups of TOUCH'N'GO. *See* Bousfield Decl. ¶ 11; Sivan Decl. ¶ 9. On December 17, 1998, Elysee faxed a letter to Tactica containing the selling points for the "NEW IGIA HAIR REMOVER PROPOSED NAME: TOUCH'N'GO" for Tactica's review. *See* Pl.Ex. 4. On that same day, Tactica sent a fax to Elysee informing Bousfield that a trademark search revealed that the name TOUCH'N'GO was available for use in connection with the hair removal product. *See* Pl.Ex. 9. Tactica and Elysee then confirmed their discussions and mutually agreed to proceed with the name TOUCH'N'GO. *See* Tr. at 116, 193 (Bousfield), 288–89 (Ramchandani). On April 29, 1999, Tactica filed an "intent-to-use" application for the name TOUCH'N'GO with the PTO. *See* Sivan Decl. ¶ 17; Pl.Ex. 10. Elysee had no objection to Tactica's application. *See* Tr. at 181 (Bousfield).[8]

---

**8.** Again, Bousfield had no objection to Tacti-

ca's intent to register the name because he

Elysee decided to have TOUCH'N'GO manufactured by the Newford Company, Ltd. in Hong Kong. *See* Tr. at 108 (Bousfield). Relying on the drawings provided by Elysee, Newford prepared the final engineering specifications and tooling for TOUCH'N'GO. *See* Def. Ex. 11. During the development period, Tactica was kept aware of the features and progress of the product. *See* Tr. at 109 (Bousfield). All costs associated with the production of TOUCH'N'GO were borne by Elysee, who in turn recovered its costs, as well as a profit, through its selling price.[9] *See* Tr. at 110–113 (Bousfield); 278 (Ramchandani).

Unlike CELLULIFT, the first shipment of TOUCH'N'GO was not to Tactica. *See* Tr. at 118, 148 (Bousfield); Def. Ex. 29. Elysee caused TOUCH'N'GO to be shipped by Newford under the name Elysee Electro to England, France, Australia, Scandinavia, Holland and Belgium. *See* Tr. at 118 (Bousfield). Before making its first shipment to Tactica, Elysee shipped and sold approximately 10,000 units of TOUCH'N'GO, mostly to the United Kingdom. *See* Tr. at 152–53 (Bousfield).

Tactica began receiving shipments of TOUCH'N'GO in November 1999. *See* Tr. at 118 (Bousfield). All TOUCH'N'GO products shipped to Tactica bore the name IGIA TOUCH'N'GO. *See* Tr. at 174 (Bousfield). Prior to shipping IGIA TOUCH'N'GO to the United States, Tactica and Elysee decided jointly to retain

CRL to perform a clinical trial. *See* Tr. at 119 (Bousfield). On April 16, 1999, Elysee faxed a letter to Marc Shaffer of CRL, indicating that the cost of the testing would be borne equally by both Elysee and Tactica. *See* Pl.Ex. 8; Def. Ex. 19. However, the entire cost of the testing, $30,000, was paid by Elysee. *See* Def. Exs. 20–25.

The last shipment of IGIA TOUCH'N'GO to Tactica occurred on July 25, 2000. *See* Tr. at 152 (Bousfield); Def. Ex. 31. In total, 26,000 units of the IGIA TOUCH'N'GO were shipped to Tactica. Elysee has caused approximately 55,000 units of the Elysee Electro TOUCH'N'GO to be shipped elsewhere in the world. *See* Tr. at 149 (Bousfield).

## C. The Packaging for Tactica's CEL-LULIFT and IGIA TOUCH'N'GO

The brand name Elysee is not mentioned anywhere on the packaging for the CELLULIFT or IGIA TOUCH'N'GO sold to or on behalf of Tactica. The manual included with the IGIA TOUCH'N'GO states that the product "is manufactured to the exclusive UK design of IGIA Direct. . . ." Pl.Ex. 14.[10] Consumers are directed to send all comments or complaints to IGIA Direct, *see* Pl.Ex. 14, and any consumer who contacts IGIA Direct is sent a gift of appreciation by Tactica. *See id.;* Tr. at 71 (Ramchandani). The manual also states that the "TOUCH'N'GO Hair Removal System is a registered trademark of IGIA Direct Inc." Pl.Ex. 14.

assumed Tactica was going to be his exclusive distributor in the United States.

**9.** Newford sent an invoice directly to the purchaser of the products. Newford would invoice the purchaser at Elysee's selling price, and Elysee would then invoice Newford for its profit margin. *See* Tr. at 148–49; Def. Ex. 29. For example, if Newford charged Elysee $12 for each unit, and Elysee's selling price was $18 a unit, Newford would invoice the purchaser at $18 a unit, and Elysee would

then send an invoice to Newford for the difference, here $6 a unit. *See id.*

**10.** The term "UK" has no significance. The manuals for the IGIA version, for the most part, were created by removing the term "Elysee Electro" and replacing it with "IGIA." *See* Tr. at 176 (Bousfield). Apparently, the "UK" was inadvertently left in the IGIA version.

The manual included with Tactica's CELLULIFT also directs consumers to address any complaints or comments to IGIA Direct. The first page of the manual reads:

IGIA has developed a unique multi-function massager—featuring such advanced features as specifically contoured motorised rollers, Active Air suction, deep heat and vibro massage. This technique is unique to the IGIA CELLULIFT....

Pl.Ex. 17. Bousfield admitted that he wrote this passage. *See* Tr. at 259–60 (Bousfield).

### D. Tactica's Marketing and Promotion of CELLULIFT and IGIA TOUCH'N'GO

Before actually receiving shipments of CELLULIFT and IGIA TOUCH'N'GO, Tactica began to "presell" these products. Tactica's method of promotion is a three-step process. It first runs print advertisements. If this is successful, Tactica then runs television advertisements. If it is deemed to be profitable, Tactica will then produce an infomercial. *See* Tr. at 50–51 (Ramchandani).

#### 1. CELLULIFT

Starting in May 1998, Tactica began to run print advertisements for CELLULIFT. *See* Pl.Ex. 46.[11] In total, Tactica has spent $1,558,567.00 on print advertising for CELLULIFT in the United States. *See id.* These advertisements have run in national magazines such as First for Women, Soap Opera Update, Woman's World,

Mademoiselle, Redbook, Elle, Vogue, Mirabella, Cosmopolitan and many others. *See id.* During this year, Tactica's advertisements for CELLULIFT have been limited to Skymall, Woman's Own and Valassis. *See id.* In addition, Tactica has spent additional monies on "co-op" advertising—advertising contained in department store supplements. *See* Sivan Decl. ¶ 50. Tactica has spent approximately $3 million on television advertisements and produced an infomercial for CELLULIFT. *See* Sivan Decl. ¶¶ 42, 50; Tr. at 391 (Sivan). For the weeks ending August 8, 1998 and November 2, 1998, Tactica's infomercial for CELLULIFT was respectively ranked as the number five and fourteen direct response spot. *See* Pl. Exs. 53 and 57.[12] Tactica also advertises CELLULIFT on its website—*www.IGIA.com.*

As Tactica no longer has a supplier for CELLULIFT, it is only selling residual stock left over from Elysee. *See* Tr. at 319–21 (Ramchandani). Tactica intends to use the CELLULIFT name, or some variation thereof, in connection with future massage systems. *See* Tr. at 436–37 (Sivan).

#### 2. IGIA TOUCH'N'GO

Tactica began its print advertising campaign for IGIA TOUCH'N'GO in July 1999. *See* Pl.Ex. 45; Tr. at 72 (Ramchandani).[13] In total, Tactica has spent $183,869.00 on print advertising for IGIA TOUCH'N'GO in the United States. *See* Pl.Ex. 45. The advertisements were

---

**11.** Tactica has revised its original Exhibit 46 in accordance with the Court's ruling during the hearing and the revised Exhibit (along with accompanying photographs) has been received into evidence. *See* Tr. at 58–59 (Ramchandani).

**12.** These rankings were determined by Jordan Whitney, a cable and broadcast monitoring company. *See* Pl. Exs. 53 and 57.

**13.** Tactica has revised its original Exhibit 45 in accordance with the Court's ruling during the hearing and the revised Exhibit (along with accompanying photographs) has been received into evidence. *See* Tr. at 58–59 (Ramchandani).

placed in national publications such as Cosmopolitan, Mirabella, Vanidades, Woman's Own, Complete Woman, Redbook, Woman's World, and Skymall. *See id.* During this year, advertisements for IGIA TOUCH'N'GO have been limited to Skymall, Woman's Own and Valassis. *See id.* In addition, Tactica has spent additional monies on co-op advertising. *See* Sivan Decl. ¶ 25. Tactica hired SlingShot Productions to produce a five minute, two minute and one minute commercial for IGIA TOUCH'N'GO, along with a five minute instructional video. *See* Tr. at 384–85 (Sivan); Pl. Exs. 11 and 12. However, because of the termination of its relationship with Elysee and the uncertainty as to the source of the product, these commercials have never aired. *See* Tr. at 72–73 (Ramchandani). Tactica also advertises IGIA TOUCH'N'GO on its website.

As Tactica no longer has a supplier for IGIA TOUCH'N'GO, it is only selling residual stock from Elysee. *See* Tr. at 319–21 (Ramchandani). Tactica intends to use the TOUCH'N'GO name, or some variation thereof, in connection with future hair removal products. *See* Tr. at 436–37 (Sivan).

## IV. PRELIMINARY INJUNCTION STANDARD

The purpose of a preliminary injunction is to prevent irreparable injury and preserve a court's ability to render a meaningful decision on the merits. *See WarnerVision Entm't v. Empire of Carolina, Inc.*, 101 F.3d 259, 261–62 (2d Cir. 1996). Because it is "one of the most drastic tools in the arsenal of judicial remedies," *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir.1985), a preliminary injunction is an extraordinary measure that should not be routinely granted. *See Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997); *see also Ringling Brothers–Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp.*, 937 F.Supp. 204, 207 (S.D.N.Y.1996) ("Because of the great potential for harm which may occur from the issuance of a preliminary injunction, the party seeking the injunction must sustain a heavy burden."). The decision to grant a preliminary injunction rests squarely within the discretion of the trial judge. *See ImOn, Inc. v. ImaginOn, Inc.*, 90 F.Supp.2d 345, 349 (S.D.N.Y.2000).

In order to obtain a preliminary injunction Tactica must demonstrate: (1) the possibility of irreparable harm; and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking relief. *See SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 24 (2d Cir. 2000). To show a likelihood of success on the merits, Tactica "need not show that success is certain, only that the probability of prevailing is 'better than fifty percent.' " *BigStar Entm't v. Next Big Star Inc.*, 105 F.Supp.2d 185, 191 (S.D.N.Y.2000) (quoting *Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985)).

## V. DISCUSSION

### A. Trademark Infringement and Unfair Competition [14]

#### 1. Standard

To establish a claim for trademark infringement a plaintiff must prove: (1) own-

---

**14.** Because Tactica's claims of unfair competition and trademark infringement (for unregistered marks) under Section 43(a) of the Lanham Act are one in the same, they need not be addressed as separate causes of action. *See EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.*, 228 F.3d 56, 61–63 (2d Cir.2000); *Nabisco, Inc. v. Warner–Lam-*

ership of a valid mark that is entitled to the protection of the law; and (2) that the defendant's use of the mark is likely to cause confusion within the consuming public. *See Estee Lauder, Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508 (2d Cir.1997); *The Sports Auth. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir.1996); *Champagne v. Di Blasi*, 134 F.Supp.2d 310, 314 (E.D.N.Y.2001).

### 2. Analysis

#### a. Validity of the Marks

While Tactica has filed "intent-to-use" applications with the PTO, the TOUCH'N'GO and CELLULIFT marks are currently unregistered. Nonetheless, Section 43(a) of the Lanham Act provides a cause of action against any party who "in connection with any goods ... or any container for goods, uses in commerce any word, term, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship or approval of his or her goods ... by another person." 15 U.S.C. § 1125(a)(1); *see also Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 120 S.Ct. 1339, 1342, 146 L.Ed.2d 182 (2000).

An identifying, unregistered mark is capable of protection if it is either (1) inherently distinctive or (2) has acquired distinctiveness through secondary meaning. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *see also Genesee Brewing Co. v. Stroh Brewing Co.*, 124

F.3d 137, 143–44 (2d Cir.1997). Thus, those marks that are inherently distinctive will be protected without a showing of secondary meaning. *See Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir.1999); *see also La Cibeles, Inc. v. Adipar, Ltd.*, No. 99 Civ. 4129, 2000 WL 1253240, at *5 (S.D.N.Y. Sept. 1, 2000).

Determining whether a mark is inherently distinctive is both difficult and subjective. *See Majestic Drug Co. v. Olla Beauty Supply, Inc.*, No. 97 Civ. 0046, 1997 WL 37955, at *4 (S.D.N.Y. Jan. 31, 1997). Trademarks are commonly evaluated along a spectrum of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *See Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 583 (2d Cir.1993); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). Because the intrinsic nature of those marks deemed fanciful, arbitrary or suggestive serves to identify the particular source of a product, such marks are considered inherently distinctive. *See Lane Capital*, 192 F.3d at 344.

Although the defendants argue that the marks are descriptive,[15] the marks in question are more likely suggestive. A suggestive mark is one that uses names in a creative way to suggest the nature of the product. *See Winner Int'l LLC v. Omori Enters., Inc.*, 60 F.Supp.2d 62, 67 (E.D.N.Y.1999). A suggestive mark "requires imagination, thought and perception

bert Co., 220 F.3d 43, 45–48 (2d Cir.2000); *see also Menendez v. Saks and Co.*, 485 F.2d 1355, 1375 (2d Cir.1973), *rev'd on other grounds*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) ("Since there is no material difference in the law governing relief based upon trademark infringement and unfair competition, the claims are treated as one for present purposes."); *Scholastic Inc. v.*

*Stouffer*, 124 F.Supp.2d 836, 842 n. 5. (S.D.N.Y.2000) (finding plaintiff's assertion of a federal "unfair competition" claim to be duplicative of her other Section 43(a) claims).

**15.** Defendants' argument is made without prejudice to Elysee's claim of right to these marks.

to reach a conclusion as to the nature of the goods." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1040 (2d Cir.1992) (internal quotations and citation omitted). Examples of suggestive marks include AT A GLANCE calendars, CHEW'N CLEAN dentifrice, COPPERTONE sun tan oil, HANDI WIPES dusting cloths, and SPRAY'N'VAC aerosol rug cleaner. *See* J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition*, § 11:72 (4th ed. 2000) ("McCarthy") (citing to various court decisions). Clearly, a consumer must use his or her imagination and thought in order to ascertain what the mark TOUCH'N'GO, a hair removal system, suggests with respect to the nature of the product.

■ Although a closer question, the CELLULIFT mark is also suggestive. A descriptive term "conveys an *immediate* idea of the ingredients, qualities or characteristics of the goods ... or ... describe[s] the use to which a product is put." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988) (internal quotations and citations omitted) (emphasis added). While the term CELLULIFT is suggestive of a product that may help hide the appearance of cellulite, a consumer must use his or her imagination, thought and perception to link the name to the underlying product, a massage system using heat and suction technology. *See Aini, I.C.E. v. Sun Taiyang Co., Ltd.*, 964 F.Supp. 762, 774 (S.D.N.Y.1997), *aff'd, Topiclear Beauty v. Sun Taiyang Co., Ltd.*, 159 F.3d 1348 (2d Cir.1998) (finding the term TOPICLEAR to be suggestive because it "indicates to one who engages in the appropriate thought process that the product is intended for application to the skin and that it will assist the user in attaining clear skin."). Accordingly, the TOUCH'N'GO and CELLULIFT marks

are inherently distinctive and capable of protection under the law.

### b. Ownership

■ It is well established that the standard test of ownership is priority of use. *See generally* 2 *McCarthy* § 16.1 ("[O]wnership of trademark ... rights in the United States is obtained by actual use of a symbol to identify the goods or service of one seller and distinguish them from those offered by others."). Therefore, "[t]he user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially." *H.W. Carter & Sons v. William Carter Co.*, 913 F.Supp. 796, 802 (S.D.N.Y.1996) (quoting *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir.1974)). It is well settled that foreign use of a trademark cannot form the basis for establishing priority in the United States. *See Person's Co. v. Christman*, 900 F.2d 1565, 1568–69 (Fed.Cir.1990); *see also Buti v. Impressa Perosa, S.R.L.*, 935 F.Supp. 458, 468 (S.D.N.Y.1996). When "two or more companies adopt the same mark, basic rules of trademark priority determine use and ownership of the mark." *Buti*, 935 F.Supp. at 468.

In this case, both Tactica and Elysee have claimed ownership of the TOUCH'N'GO and CELLULIFT marks. Throughout the course of these proceedings, Tactica has asserted that the CELLULIFT and TOUCH'N'GO are *its own* products, which it has obtained from a Hong Kong factory, through an intermediary, Elysee. To the contrary, defendants have argued that Tactica was merely Elysee's exclusive United States distributor for these products. The truth lies somewhere in between. Tactica was more than

just an exclusive distributor for Elysee, but was not distributing its own products. Regardless, the factors used in determining the question of ownership of the TOUCH'N'GO and CELLULIFT marks are the same whether or not Tactica is given the title of "distributor". *See Ilapak Research & Dev. S.A. v. Record SpA,* 762 F.Supp. 1318, 1322 (N.D.Ill.1991) (where plaintiff argued that it was "more than a distributor," the court found that a determination of the precise nature of the parties' relationship was unnecessary since the ownership analysis would be the same "whether or nor [plaintiff] was a distributor").

■ As a general rule, where a manufacturer and exclusive distributor contest the ownership of a trademark and no agreement controls, it is the manufacturer who presumptively owns the mark. *See Sengoku Works Ltd. v. RMC Int'l, Ltd.,* 96 F.3d 1217, 1220 (9th Cir.1996); *see also Aini,* 964 F.Supp. at 774 n. 14. This presumption applies with equal force to cases involving foreign manufacturers. *See Sengoku,* 96 F.3d at 1220. However, where as here, the "goods pass through [the distributor's] hands in the course of trade and [the distributor] gives them the benefit of [its] reputation or of [its] name and business style" this presumption may be rebutted. *IMAF, S.P.A. v. J.C. Penney Co., Inc.,* 806 F.Supp. 449, 454 (S.D.N.Y.1992) (quoting *Energy Jet, Inc. v. Forex Corp.,* 589 F.Supp. 1110, 1116–17 (E.D.Mich.1984) (internal quotations and citation omitted)). In order to determine superior ownership a court should consider the following factors:

> (1) which party invented and first affixed the mark onto the product; (2) which party's name appeared with the trademark; (3) which party maintained the quality and uniformity of the product; and (4) with which party the public

identified the product and to whom purchasers made complaints.

*Sengoku,* 96 F.3d at 1220–1221; *see also Omega Nutrition U.S.A. Inc. v. Spectrum Mktg.,* 756 F.Supp. 435, 438–39 (N.D.Ca. 1991). In addition, a court may look at "which party possesses the goodwill associated with the product, or which party the public believes stands behind the product." *Premier Dental Prods. Co. v. Darby Dental Supply Co.,* 794 F.2d 850, 854 (3rd Cir.1986).

■ In this case, an analysis of these factors points to Tactica as owner of the marks. The first factor—which party invented and affixed the marks to the product—favors neither party. Although it was Tactica who originated the name CELLULIFT and Bousfield who proposed the name TOUCH'N'GO, both parties jointly agreed to use these names before production began. At the time of manufacture, the marks were affixed to the products by the Newford and Grandeur factories.

The second factor—which party's name appears with the marks—favors Tactica. Prior to January 2001, every TOUCH'N'GO and CELLULIFT product sold in the United States was sold by Tactica under the IGIA brand name. Nowhere on the packaging or in the manuals is the brand name Elysee mentioned. Bousfield was well aware of the information contained on the packaging and in the manuals included with Tactica's products. Consistent with the rule that foreign use of a trademark cannot form the basis for establishing priority in the United States, Elysee's association with TOUCH'N'GO and CELLULIFT products overseas has no effect on determining priority here.

The third factor—which party maintained the quality and uniformity of the products—favors Elysee. After the ideas for the products were conceptualized, Boy-

sen, Elysee's designer, worked closely with Grandeur and Newford in developing the designs and toolings. While Tactica worked with Elysee in determining what the products' features would be, it was Elysee who visited the factories and ensured the quality of the manufacturing process. *See* Tr. at 117–18, 144–45 (Bousfield).

The fourth factor—which party the public identified with the product and to whom purchasers made complaints—favors Tactica. Again, nowhere on the product, packaging or manuals included with the IGIA TOUCH'N'GO and CELLULIFT products sold by Tactica is the name Elysee mentioned. The manuals direct consumers to address all of their complaints, warranty claims or comments to IGIA Direct and further indicate that IGIA Direct owns the TOUCH'N'GO and CELLULIFT marks.

Finally, if

> the public believes that the exclusive distributor is responsible for the product, so that the trademark has come, by public understanding, to indicate that the goods bearing the trade-mark come from plaintiff although not made by it, or if the distributor has obtained a valuable reputation for [itself] and [its] wares by [its] care in selection of [its] precautions as to transit and storage, or because [its] local character is such that the article acquires a value by [its] testimony to its genuineness, that is proof that [it] possesses the goodwill associated with the product.

*Premier Dental,* 794 F.2d at 854 (internal quotations and citations omitted).

Tactica sells its products to almost every major department store, retailer, and most chain drug store operations in the United States. *See* Tr. at 42 (Ramchandani); *see also* Photographs accompanying Pl. Exs. 45 and 46. IGIA Direct guarantees the quality of its products and the IGIA brand name is widely recognized in the industry. For these reasons, it is likely that Tactica will be found the owner of the TOUCH'N'GO and CELLULIFT marks in the United States.[16] *See Distillers Brands v. American Distilling Co.,* 26 F.Supp. 988, 989 (S.D.N.Y.1938) ("Where a trademark indicates a distributor of merchandise rather than the maker, it is the distributor who acquires the trade-mark rights ... [f]or the public associates the goods so marked with the distributor and knows not the identity of the maker.").

### c. Likelihood of Confusion

 The likelihood of confusion inquiry entails the consideration of the factors set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961):(1) the strength of plaintiff's mark; (2) the degree of similarity between plaintiff's and defendants' marks; (3) the proximity of the products; (4) the likelihood that either owner will bridge the gap, using the mark on products closer to the other's area of commerce; (5) the sophistication of the buyers and the quality of the defendants' product; (7) actual confusion; and (8) good or bad faith. *See TCPIP Holding Co., Inc. v. Haar Communica-*

---

**16.** At the end of the hearing I asked the parties to brief the issue of Tactica's possible abandonment of these marks. In order to establish abandonment a defendant must prove plaintiff's (1) non-use and (2) intent not to resume use of the marks. *See Silverman v. CBS, Inc.,* 870 F.2d 40, 45 (2d Cir.1989). While Tactica does not have a current supplier for the TOUCH'N'GO and CELLULIFT products, it is selling its residual stock and has indicated its intention to continue using these marks in the future. *See* Tr. at 334 (Ramchandani); 436–37 (Sivan). Therefore, Tactica has not abandoned its rights to these marks.

*tions, Inc.,* 244 F.3d 88, 100 (2d Cir.2001). A court's evaluation of these factors should not be mechanical, nor is any single factor determinative. *See Plus Prods. v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1004 (2d Cir.1983). Rather, a court should focus on the ultimate question of whether consumers are likely to be confused. *See Paddington,* 996 F.2d at 584.

### (1) Strength of the Marks

The strength of a suggestive mark must be viewed in reference to its commercial context. *See Bristol–Myers,* 973 F.2d at 1044. "[A] mark may be conceptually strong and yet commercially weak if the mark lacks the requisite 'origin-indicating' quality in the eyes of consumers." *Sunenblick v. Harrell,* 895 F.Supp. 616, 626 (S.D.N.Y.1995) (citation omitted). While secondary meaning is not a required showing with every type of mark, evidence of secondary meaning is relevant to assessing the strength of the mark under the *Polaroid* test. *See id.* In evaluating the existence of secondary meaning, courts look to six factors: (1) the senior user's advertising and promotional expenses; (2) consumer studies linking the name to the source; (3) the senior user's sales success; (4) third party uses and attempts to plagiarize the mark; (5) length and exclusivity of the mark's use; (6) unsolicited media coverage of the products at issue. *See Thompson Med. Co. v. Pfizer, Inc.,* 753 F.2d 208, 217 (2d Cir.1985).

Tactica has spent $1,558,567.00 on print advertising for CELLULIFT and $183,869.00 on TOUCH'N'GO. *See* Pl. Exs. 45 and 46. Tactica has spent additional monies on "co-op" advertising for these products, and over $3 million on television adverting for CELLULIFT. Tactica has been using the CELLULIFT and TOUCH'N'GO marks in the United States exclusively since May 1998 and No-

vember 1999, respectively. To date, Tactica has sold approximately 142,000 units of CELLULIFT and 26,000 units of TOUCH'N'GO. Tactica has produced no evidence of consumer studies linking these marks to the IGIA name nor any unsolicited media coverage.

While the evidence is not overwhelming, these marks appear to be of moderate strength.

### (2) Similarity of the Marks

"The comparison of marks is an inquiry designed to determine the 'general impression conveyed to the purchasing public by the respective marks.' " *Hasbro,* 858 F.2d at 77 (2d Cir.1988) (quoting *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir.1985)). In assessing the similarity between two marks, a court will look to whether the similarity is likely to cause consumer confusion. *See Sports Auth.,* 89 F.3d at 962. Here, the marks defendants wish to use— TOUCH'N'GO and CELLULIFT 2—are virtually identical to Tactica's marks. The only difference in the marks is the addition of the numeral "2". Generally, "[c]ases where a defendant uses an identical mark on competitive goods ... are 'open and shut' and do not involve protracted litigation to determine liability for trademark infringement." 3 *McCarthy* § 23.20 (citation omitted). This factor favors Tactica.

### (3) Proximity of the Products

The third factor, proximity of the products, "addresses whether, due to the commercial proximity of the competitive products, consumers may be confused as to their source." *Hasbro,* 858 F.2d at 77 (2d Cir.1988). Proximity is measured by "the nature of the products themselves and the structure of the relevant market." *Vitarroz v. Borden, Inc.,* 644 F.2d at 967 (2d Cir.1981). Relevant findings include the class of consumers to whom the goods are sold, the manner of advertising, the chan-

nels through which the goods are sold, and the extent to which the goods or services fall within the same class or are used together. *See Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir.1996).

Although a few modifications were made to CELLULIFT 2, the products are quite similar and are designed for the same purpose. Tactica sells CELLULIFT and TOUCH'N'GO to catalog distributors and retail stores, the same distribution channels Elysee plans on using for its products. In fact, TG, who is now purchasing these products directly from Elysee, formerly bought them from Tactica. The proximity of the products is therefore sufficiently close to create a likelihood of confusion.

### (4) Bridging the Gap

"The issue here is whether the two companies are likely to compete directly in the same market." *Charles of the Ritz Group, Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1322 (2d Cir.1987). There is no doubt that Tactica and Elysee would compete directly against each other in the same market.

### (5) Sophistication of Buyers and Quality of Defendants' Product

As Tactica has presented no evidence with respect to the sophistication of buyers or the quality of defendants' products, these factors are not addressed.

### (6) Actual Confusion

The Lanham Act does not require evidence of actual confusion as a prerequisite to recovery. *See Lois Sportswear U.S.A.,*

*Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986) ("[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source."). While Tactica has not presented any evidence of actual consumer confusion, it has presented some evidence of confusion in the marketplace. During the week ending February 2, 2001, an infomercial for CELLULIFT aired in the United States. The marketing company behind the product was not identified. Although Tactica was not involved with this production, Infomercial Monitoring Service ("IMS"), a tracking service that monitors paid programming in the United States, assumed Tactica was the marketing company and noted this fact in its records. *See* Pl.Ex. 58; Transcript of 4/10/01 Telephone Hearing at 3–7 (Testimony of Samuel Catanese, Publisher and CEO of IMS).

### (7) Good or Bad Faith

This factor concerns whether the defendants adopted the marks with the intention of capitalizing on Tactica's reputation and goodwill, as well as any customer confusion as to the source of the products. *See Cadbury*, 73 F.3d at 482–83. Tactica has presented insufficient evidence to warrant giving this factor any weight in its favor.

 Weighing all of these factors, I conclude that defendants' use of the CELLULIFT and TOUCH'N'GO marks in the United States is likely to cause consumer confusion.[17]

---

**17.** In its supplemental brief, TG asserts that even if Tactica is determined to own the common law rights to these marks, it is entitled to relief only in the geographic areas in which Tactica proves the marks have achieved market recognition. However, this assertion is incorrect. In order for this "limited area" defense to apply, TG must prove: (1) that its first use of the TOUCH'N'GO and CELLULIFT marks in the United States was in "good faith"—that is, it had no knowledge of Tactica's prior use of the marks, *see Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866, 877 (E.D.N.Y.1978) (actual notice negates an inference of good faith); and (2) its first use of the marks in the United States

### 3. Irreparable Harm

■ Generally, once a likelihood of confusion is shown for a trademark or trade dress infringement claim, the requisite irreparable harm is established. *See Toy Mfrs. of Am. v. Helmsley–Spear, Inc.*, 960 F.Supp. 673, 678 (S.D.N.Y.1997) (a presumption of irreparable harm arises where " 'there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.' ") (quoting *Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 66 (2d Cir.1985)); *see also Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 967 (2d Cir.1995).

■ Defendants argue that Tactica's delay in seeking a preliminary injunction negates any inference of irreparable harm. As the Second Circuit noted:

[A]ny such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief. Though such delay may not warrant the denial of ultimate relief, it may, standing alone, ... preclude the granting of preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.

*Tough Traveler*, 60 F.3d at 968 (internal quotations and citations omitted); *see also Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F.Supp.2d 417, 419 n. 1 (S.D.N.Y.

1998) ("Even in the absence of prejudice, an unwarranted delay may demonstrate that the movant has no need for the drastic remedy of a preliminary injunction."). However, "a delay in filing suit will not rebut the presumption of irreparable harm if the plaintiff does not know how severe the infringement is.... Similarly, a delay caused by a plaintiff's good faith efforts to investigate an infringement does not rebut the presumption of irreparable harm." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 39 (2d Cir.1995).

While Tactica learned in September 2000 that Elysee would no longer ship Tactica CELLULIFT and TOUCH'N'GO, *see* Def. Ex. 42, it did not learn until January 2001 that these products were being sold in the United States under the Elysee brand name. *See* Tr. at 433 (Sivan). Tactica immediately began to investigate defendants' activities, and commenced this action and moved for injunctive relief only a month later. Tactica's request for injunctive relief is timely. *See Eve of Milady v. Impression Bridal, Inc.*, 957 F.Supp. 484, 490 (S.D.N.Y.1997) ("The requirement that a plaintiff must seek injunctive relief in a timely manner is flexible, and courts look to the facts of each case to determine the consequences of a plaintiff's delay.").

## B. Trade Dress

### 1. Standard

■ Following the Supreme Court's recent decision in *Wal–Mart*, recovery for product design trade dress infringement under Section 43(a) of the Lanham Act

---

occurred in a "remote area"—that is, an area where Tactica's marks were not known by the customers in that territory. *See generally* 4 *McCarthy* § 26.4. Here, TG, who is now purchasing the TOUCH'N'GO and CELLULIFT products directly from Elysee, formerly bought them from Tactica. Further, TG was selling, and hopes to sell in the future, Ely-

see's TOUCH'N'GO and CELLULIFT products through the same channels of distribution as Tactica used. As TG had knowledge of Tactica's use of the marks and is targeting the same customers as it did when it was purchasing the TOUCH'N'GO and CELLULIFT products from Tactica, this defense is unavailing.

requires a showing that (1) the trade dress has acquired a secondary meaning in the marketplace, and (2) there is a likelihood of confusion of the allegedly infringed and infringing products. *See Wal–Mart*, 529 U.S. at 213–216, 120 S.Ct. 1339; *see also Eastern America Trio Prods., Inc. v. Tang Elec. Corp.*, 97 F.Supp.2d 395, 414 (S.D.N.Y.2000). In addition, functional product design is not protected under Section 43(a) of the Lanham Act. *See* 15 U.S.C. § 1125(a)(3) ("In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."). The Supreme Court recently stated that placing the burden of proof as to functionality on the party asserting infringement "gives force to the well-established rule that trade dress protection may not be claimed for product features that are functional." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 121 S.Ct. 1255, 1259, 149 L.Ed.2d 164 (2001).

### 2. Analysis [18]

Tactica has failed to meet its burden on this claim. Tactica's trade dress claim in CELLULIFT is based upon the design of the handle. Tactica has introduced no evidence that the handle of CELLULIFT has acquired a secondary meaning. Further, Sivan testified that the "main" reason he chose the shape of the handle was to make it easy and comfortable for a woman to hold the product on her thighs and back. *See* Tr. at 387–89 (Sivan). As functional product design is not protected by the Lanham Act, Tactica's trade dress claim must fail.

### C. Other Federal Claims

Tactica also alleges that defendants are infringing upon its design patent for its PROTONIQUE hair brush and engaging in false advertising by using the IGIA name to promote Elysee's TOUCH'N'GO and CELLULIFT 2 products. On the first day of the hearing, defendants represented that they are not selling an ionic hairbrush and therefore have no objection to being preliminary enjoined from doing so in the future. *See* Tr. at 28–29. As defendants recognize Tactica's ownership of the IGIA mark, they have also consented to being enjoined from using the IGIA name to promote their products. *See id.*

### D. Claims under New York Law

#### 1. Unfair Competition

"[T]he essence of unfair competition under New York common law is the 'bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.' " *Rosenfeld v. W.B. Saunders, A Div. of Harcourt Brace Jovanovich, Inc.*, 728 F.Supp. 236, 249–50 (S.D.N.Y.1990) (quoting *Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.*, 678 F.Supp. 424, 429 (S.D.N.Y. 1987), *aff'd*, 923 F.2d 845 (2d Cir.1990)).

As Tactica is entitled to a preliminary injunction with respect to the CELLULIFT and TOUCH'N'GO marks, there is no need to address this claim.

#### 2. Misappropriation of Trade Secrets

According to Tactica, Ferreira and Ricafort are misappropriating Tactica's customer lists and confidential price, discount and volume information relating to its transactions with suppliers, manufacturers, fulfillment houses and retailers.

**18.** Tactica has not asserted a trade dress claim for TOUCH'N'GO.

To succeed on a claim for misappropriation of trade secrets under New York law Tactica must demonstrate: "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir.1999). "[A] trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" *Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.*, 118 F.3d 955, 968 (2d Cir.1997) (quoting Restatement of Torts § 757 cmt. b (1939)). In determining whether information constitutes a trade secret, New York courts have considered the following factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F.Supp. 547, 556 (E.D.N.Y.1995).

### a. Customer Information

■ *First*, with respect to the identity of Tactica's customers, courts have held that "where a company's customers are not readily ascertainable, but must be cul-

tivated with great effort and secured through the expenditure of considerable time and money, the names of those customers are protectible trade secrets." *Id.* at 556–57; *see also Panther Sys. II, Ltd. v. Panther Computer Sys., Inc.*, 783 F.Supp. 53, 67 (E.D.N.Y.1991); *Webcraft Technologies, Inc. v. McCaw*, 674 F.Supp. 1039, 1045 (S.D.N.Y.1987); *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 393, 328 N.Y.S.2d 423, 278 N.E.2d 636 (1972). However, "a former employee may not be enjoined from soliciting his or her former employer's customers where the names and addresses of potential customers are readily discoverable through public sources." *Ivy Mar*, 907 F.Supp. at 557; *see also Reed, Roberts Assocs. v. Strauman*, 40 N.Y.2d 303, 308–09, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976).

AHI sells its products to catalog companies. Tactica has produced no evidence showing that it spent a great deal of time, money or effort in cultivating a list of catalog companies with which it does business. Moreover, Tactica admitted that the identity of the catalog companies to which it sells its beauty-products is "not a secret." Tr. at 359 (Ramchandani).[19]

■ *Second*, with respect to customer preferences, "remembered information as to specific needs and business habits of particular customers is not confidential." *Catalogue Serv. of Westchester, Inc. v. Henry*, 107 A.D.2d 783, 484 N.Y.S.2d 615, 616 (2d Dep't 1985) (quoting *Anchor Alloys, Inc. v. Non–Ferrous Processing Corp.*, 39 A.D.2d 504, 336 N.Y.S.2d 944 (2d Dep't 1972)); *see also DataType Int'l, Inc. v. Puzia*, 797 F.Supp. 274, 283 (S.D.N.Y.1992). Tactica has not produced any evidence showing that Ferreira or Ricafort copied, inten-

---

**19.** Neither is the identity of the retail stores to which Tactica sells its products, i.e., Macy's, K–Mart, Lord & Taylor, etc.

---

tionally memorized, or stole any information. *See Levine v. Bochner*, 132 A.D.2d 532, 517 N.Y.S.2d 270, 271 (2d Dep't 1987) ("The use of information about an employer's customers which is based on casual memory is not actionable."). Information concerning the preferences of Tactica's customers could easily be recalled by Ferreira or Ricafort, or obtained by contacting the customers directly. Accordingly, this information is not a trade secret.

#### b. Pricing Information

■ Tactica also alleges that while employed at Tactica, Ferreira and Ricafort learned the prices Tactica paid its manufacturers (i.e., Elysee) for its products and the prices Tactica charged its customers (i.e., TG), and is currently using this information to Tactica's detriment. Although this information may have a competitive value, it does not necessarily follow that an injunction should issue.

In order to obtain a preliminary injunction, Tactica must "put forth sufficient evidentiary proof to show what specific data the individual defendants misappropriated...." *H. Meer Dental Supply Co. v. Commisso*, 269 A.D.2d 662, 702 N.Y.S.2d 463, 465 (3rd Dep't 2000). Tactica has failed to do so. Ferreira and Ricafort stated in their affidavits that they never used Tactica's proprietary or pricing information in connection with AHI. *See* Ferreira Aff. ¶ 36; Ricafort Aff. ¶ 6. In light of the lack of specific evidence to the contrary, Tactica has failed to make the requisite evidentiary showing that it is likely to succeed on the merits of this claim.[20] *See Hancock v. Essential Resources, Inc.*, 792 F.Supp. 924, 928 (E.D.N.Y.1992) ("Prelimi-

nary injunctive relief cannot rest on mere hypotheticals" concerning a former employee's misconduct).

#### 3. Breach of the Confidentiality Agreements

■ The Confidentiality Agreement that Ferreira and Ricafort signed states:

1. The Employee hereby agrees that the Employee will not reveal ... any information whatsoever obtained in the course of his/her employment relating to any aspect whatsoever of the Employer's business strategies, decision making process, customers, sources, or related information, to any other person, company, entity, group or individual.

2. The Employee shall keep confidential any and all information obtained in the course of employment about the Employer, its affairs, relationships to actual or potential customers, and the needs and requirements of any such actual or potential customers, and shall not directly or indirectly enter the employ of . or render any service to any person, partnership, association or corporation engaged in the business of mail order marketing or telemarketing for a period of one (1) year from the departure of the employ of the Employer.

Pl. Exs. 54 and 55. Tactica asserts that "[i]n using Tactica's confidential price, discount and volume information, [Ferreira and Ricafort have] breached these agreements." Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction at 18. Ferreira and Ricafort stated in their affidavits that they have not used Tactica's proprietary or confidential information in connection with AHI. *See* Ferreira Aff. ¶ 36; Ricafort Aff.

---

**20.** Even if Ferreira and/or Ricafort misappropriated Tactica's pricing information, because pricing decisions are based on current marketplace data, *see Ivy Mar*, 907 F.Supp. at 558, enjoining Ferreira and/or Ricafort from using such outdated information would not protect Tactica from harm.

¶ 6. Again, Tactica's vague allegations to the contrary are insufficient to show a likelihood of success on the merits of this claim.

### 4. Breach of Fiduciary Duty

■ In the absence of a non-compete or confidentiality agreement, an employee may still be enjoined from using confidential information where he or she has obtained such information by wrongful means, such as theft or intentional memorization. *See Ivy Mar,* 907 F.Supp. at 560 The rationale for an injunction in such cases is that the ex-employee has breached a fiduciary duty to the former employer by engaging in misconduct during the course of his or her employment. *See id.*

■ Tactica relies on *DoubleClick Inc. v. Henderson,* No. 116914/97, 1997 WL 731413, at *5 (1997), for the proposition that even if it cannot prove Ferreira and Ricafort's unlawful activities, the "inevitable disclosure" of trade secrets or confidential information in this case warrants injunctive relief. However, this case is easily distinguished. In *DoubleClick,* the defendants were senior executives working for an Internet company who were caught misappropriating trade secrets as they attempted to form a competing company. Based on the evidence of *actual* misappropriation, which was "bolstered by ... a high probability of 'inevitable disclosure' of trade secrets," the court enjoined the defendants from launching their company, or accepting employment with any competing company, for a period of six months. *Id.* at *5–6. *DoubleClick's* holding rested *heavily* on evidence of defendants' overt theft.

In this case, neither Ferreira nor Ricafort were senior level executives at Tactica. At the time of their resignation Ferreira and Ricafort were respectively earning $700 and $650 in gross weekly income. *See* W–2 Form, Ex. A to Ricafort Aff.; W–2 Form, Ex. C to Ferreira Aff. Further, Tactica has not presented any evidence of overt theft or actual misappropriation of either trade secrets or confidential information. *See EarthWeb, Inc. v. Schlack,* 71 F.Supp.2d 299, 310 (S.D.N.Y.1999) ("[I]n its purest form, the inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory. Absent evidence of actual misappropriation by an employee, the doctrine should be applied in only the rarest of cases."). Tactica has not shown a likelihood of success on the merits of this claim.

### 5. Tortious Interference with Contractual Relations

■ Tactica asserts that Ferreira, Ricafort and AHI have tortiously interfered with Tactica's supply, manufacture, and retail contracts, as well as its contracts with employees. To prove *tortious interference* with contracts under New York law, Tactica must show: (1) the existence of a contract between itself and a third party; (2) defendants' knowledge of the contract; (3) defendants' intentional procurement of the third party to breach or otherwise render performance impossible; and (4) damages. *See Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996); *see also Shannon v. MTA Metro–North R.R.,* 269 A.D.2d 218, 704 N.Y.S.2d 208, 209 (1st Dep't 2000). The evidence in the record does not support the likelihood of such a finding.

### E. Contempt

■ In addition to seeking preliminary injunctive relief, Tactica has moved for an Order of Contempt requiring TG to pay Tactica's reasonable costs and attorneys' fees arising from TG's alleged breach of the TRO. Tactica alleges that TG was still

advertising and selling Elysee's TOUCH'N'GO and CELLULIFT 2 products through its website after the TRO had been entered.

A contempt order is a "potent weapon," *Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967), to which courts should not resort "where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *California Artificial Stone Pav Co. v. Molitor,* 113 U.S. 609, 618, 5 S.Ct. 618, 28 L.Ed. 1106 (1885). It is only warranted when "(1) the order ... is clear and unambiguous; (2) the proof of non-compliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995).

The TRO states that "the defendant is temporarily restrained and enjoined from intentionally infringing Tactica's trademark and patent rights." It does not delineate the activities defendants are prohibited from engaging in or what trademark and patent rights are at issue. Mark Wills, Director of Operations and Purchasing for TG, stated in his declaration that he did not understand the TRO to require preexisting copy regarding the TOUCH'N'GO and CELLULIFT to be removed from TG's website. *See* Declaration of Mark Wills in Response to Motion for Contempt ¶ 3. Further, Tactica has not shown that TG's actions were intentional. Although Tactica has produced evidence that Elysee's CELLULIFT and TOUCH'N'GO products were being sold through TG's website after entry of the TRO, *see* Declaration of Maria Fostieris ¶¶ 6–10, this was due to TG's innocent failure to ensure that returned CELLULIFT and TOUCH'N'GO products were not re-entered into inventory. *See* Supplemental Declaration of Mark Wills ¶¶ 2–3. Upon learning of this oversight, Wills immediately corrected the problem. *See id.* Tactica's request is denied.

## VI. CONCLUSION

In accordance with the rulings set forth above, it is hereby ORDERED that:

Defendants, Atlantic Horizon International, Inc., Robert Ferreira, Alice Ricafort, Taylor Gifts, Elysee Cosmetics, Ltd., Elysee Beauty Products, Ltd., and Patrick Bousfield, their agents, servants and employees and all those in active concert and participation with them, are preliminarily enjoined from (1) using the TOUCH'N'GO trademark in any manner to sell, distribute, advertise or promote Elysee's TOUCH'N'GO product in the United States; (2) using the CELLULIFT trademark in any manner to sell, distribute, advertise or promote Elysee's CELLULIFT or CELLULIFT 2 products in the United States; (3) using Tactica's patented design in the PROTONIQUE product in any manner to sell, distribute, advertise or promote the Ionic Hair Brush product in the United States; (4) using Tactica's IGIA trademark in any manner, including but not limited to the sale, distribution, advertising or promotion of Elysee's products. Defendant Taylor Gifts is preliminary enjoined from any further sale of Elysee's TOUCH'N'GO, CELLULIFT and CELLULIFT 2 products.

It is further ORDERED that:

Tactica shall issue a bond in the amount of $ 100,000 for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

This ORDER does not prohibit defendants from selling Elysee's

TOUCH'N'GO, CELLULIFT or CEL-
LULIFT 2 products under different
names, nor does it apply to any of defen-
dants' activities outside the United
States.

While this ORDER applies to all defen-
dants, because Elysee Cosmetics Ltd.,
Elysee Beauty Products, Ltd., and Pat-
rick Bousfield were not made parties to
this action until the preliminary injunc-
tion proceedings had begun, should they
wish to offer additional evidence war-
ranting their exclusion from this OR-
DER, they may seek leave to submit
such evidence to the Court.

SO ORDERED.